[No. 6441-7-III. Division Three. May 21, 1985.]

FRED J. MOORE, INC., *Respondent,* v. ELBERT B. SCHINMANN, ET AL, *Appellants.*

*Patrick Hussey* and *Velikanje, Moore & Shore, Inc., P.S.,* for appellants.

*David K. Crossland, Don W. Schussler, J. Tappan Menard,* and *Gavin, Robinson, Kendrick, Redman & Mays, Inc., P.S.,* for respondent.

MUNSON, J.—Mr. and Mrs. Elbert B. Schinmann appeal a judgment of $42,739 and decree foreclosing Fred J. Moore, Inc.'s (Moores), seed lien and real estate mortgage. The Schinmanns contend: (1) the Moores were "merchants" for purposes of the Uniform Commercial Code's (RCW Title 62A) implied warranty of merchantability; (2) this court should rule as a matter of law the Scotch mint roots were not merchantable; (3) there was insufficient evidence of trade usages to explain "Scotch Mint Roots . . . of a

good solid stand"; (4) the Schinmanns timely revoked acceptance of the roots; and (5) the Moores' seed lien is invalid because a mint root is not a seed. We affirm.

The Schinmanns have been growing spearmint and peppermint for oil since 1946. In 1981, they wished to purchase Scotch mint (spearmint) roots and asked a mint buyer if he knew of anyone who had roots for sale. The buyer suggested the Moores. At first, the Moores said they had none for sale, but later decided to take out one field. Although the Moores had been raising mint for oil since the early 1960's, this was their first sale of roots.

In December 1981, Mr. Schinmann and his farm manager, Louis Wiles, walked the field which was for sale. The ground was frosted over, and it was very difficult to determine the mint variety from examining the roots. Mr. Schinmann told Henry Moore (Fred's son) he thought some of the roots looked like peppermint. Henry claims he told Mr. Schinmann he was welcome to check the mint buyer's assay from the previous year's crop. Mr. Schinmann, on the other hand, claims Henry said the odd–looking roots were hybrid or nuclear Scotch roots from Oregon, and that all the roots were Scotch. Both Fred Moore, Sr., and Louise Moore, his wife, are certain they told Mr. Schinmann there was scattered peppermint in the field.

The parties entered into an agreement, drafted by the Moores' attorney, for "Scotch Mint Roots . . . of a good solid stand" at $1,000 per acre. The Schinmanns executed a promissory note for $42,739 at 18 percent interest, secured by a mortgage on their property. When the note was not paid, Louise Moore filed a notice of seed lien against the Schinmanns' mint crop.

The roots from this field, when processed by the Moores for oil, contained 1 to 8 percent peppermint. However, the Schinmanns' crop emerged with up to 50 percent peppermint. Mr. Benitz, a mint farmer, testified peppermint plants are hardier than Scotch mint. Any problem with peppermint contamination would therefore be magnified when the roots from one small field are dug up and spread

out over a large field. He also testified peppermint could be transferred to a Scotch mint field from equipment used on both fields. Fred Moore, Sr., likewise stated farming practices would affect the level of contamination. Mr. Schneider, a mint oil buyer, testified it was "hard to imagine" a field with 8 percent contamination would plant out to 40 percent.

All mint oil is assayed to determine the percentage of off–variety contamination. The evidence indicates up to 10 percent contamination is acceptable in a barrel of spearmint oil. However, the assay usually takes place after the oil has been purchased from the growers. If the mint buyer has seen a field before harvest and it looks "clean", he will contract for the oil without first ordering an assay. It is not standard practice to tell mint growers the results of the assays, unless there was more than 10 percent contamination. Nor is it common for a grower interested in purchasing roots to check the assay of the previous year's crop. Here, the mint buyer did not tell the Moores the results of the previous year's assay until they inquired after Mr. Schinmann complained about the peppermint contamination.

Louise Moore testified she told Mr. Schinmann she was asking only $1,000 per acre because the roots were not pure Scotch. Pure Scotch roots would sell for $2,000 per acre, and she had paid $3,000 per acre for roots certified through the state certification program. Mr. Benitz testified $1,000 per acre for a solid stand was a very good price from the buyer's viewpoint.

There was conflicting testimony whether "solid stand" conveys anything about variety. It was undisputed, however, that "solid stand" means "no holes," or a good solid mat of roots. "Clean" refers to the absence of weeds, which may or may not refer to peppermint.

Summary judgment was granted for the Moores on their seed lien claim. After a trial, the court found against the Schinmanns on their warranty claims. Judgment was entered for the Moores for the amount of the note and

foreclosing the Moores' seed lien and land mortgage. The Schinmanns appeal.

The Schinmanns first contend the Moores are merchants for purposes of the implied warranty of merchantability. Three courses of conduct can bring one within the definition of merchant: (1) deal in goods of the kind involved in the transaction; (2) hold oneself out as having knowledge or skill peculiar to the goods involved; or (3) deal through an agent or broker who holds himself out as having the requisite skill or knowledge. RCW 62A.2–104(1).

■ The Schinmanns argue the Moores held themselves out as having skill in and knowledge of mint roots. However, to be liable for an implied warranty of merchantability, a merchant must deal in goods of the kind involved. RCW 62A.2–314.

> Obviously this qualification restricts the implied warranty to a much smaller group than everyone who is engaged in business and requires a professional status as to particular kinds of goods.

Official Comment 2, RCWA 62A.2–104.

> A person making an isolated sale of goods is not a "merchant" within the meaning of the full scope of this section and, thus, no warranty of merchantability would apply.

Official Comment 3, RCWA 62A.2–314.

The cases interpreting section 2–314 are in accord with the comments in holding the definition of merchant is more limited for purposes of the implied warranty of merchantability, section 2–314, than under the general definition of merchant, section 2–104. In *Fear Ranches, Inc. v. Berry,* 470 F.2d 905 (10th Cir. 1972), *aff'd,* 503 F.2d 953 (10th Cir. 1974), a cattle seller was held to be a merchant with respect to sales to packers but not with respect to an isolated sale to a nonpacker. Similarly, in *Rock Creek Ginger Ale Co. v. Thermice Corp.,* 352 F. Supp. 522 (D.D.C. 1971), a beer manufacturer was held not to be a merchant with respect to an isolated sale of carbon dioxide to a soft drink manufacturer. The court in *Vince v. Broome,* 443 So. 2d 23 (Miss.

1983) also recognized the definition of merchant in section 2–314 is more limited than that in section 2–104.

The Schinmanns rely upon *Musil v. Hendrich,* 6 Kan. App. 2d 196, 627 P.2d 367 (1981). That case contains dicta from which it may be inferred a merchant who holds himself out to have certain skills or knowledge is subject to section 2–314. First, the farmer there dealt in goods of the kind involved (feeder pigs). Second, the court held the plaintiff failed to establish a standard of merchantability in the sale of feeder pigs. *Musil v. Hendrich,* 627 P.2d at 373. Therefore the issue presented here was not before the court in *Musil. See also* Annot., *Farmers as "Merchants" Within Provisions of UCC Articles 2, Dealing With Sales,* 95 A.L.R.3d 484 (1979); Annot., *Who Is "Merchant" Under UCC § 2–314(1) Dealing With Implied Warranties of Merchantability,* 91 A.L.R.3d 876 (1979).

▮ Whether a farmer is a merchant under the Uniform Commercial Code is a question of fact unless the facts are undisputed. *Pierson v. Arnst,* 534 F. Supp. 360 (D. Mont. 1982); *Sebasty v. Perschke,* ___ Ind. App. ___, 404 N.E.2d 1200 (1980); *Vince v. Broome, supra; Currituck Grain Inc. v. Powell,* 38 N.C. App. 7, 246 S.E.2d 853 (1978); *Nelson v. Union Equity Co–op. Exch.,* 548 S.W.2d 352, 95 A.L.R.3d 471 (Tex. 1977); 1 R. Anderson, *Uniform Commercial Code* § 2–104:44, at 547 (3d ed. 1981). The Schinmanns do not take exception to the trial court's finding this was the first and only sale of roots by the Moores. The Moores dealt in mint oil, not roots. They were not merchants for purposes of the issues in this case. Thus, we need not address the Schinmanns' contentions regarding merchantability.

▮ The Schinmanns next contend the Moores did not adequately prove trade usage to explain "Scotch Mint Roots . . . of a good solid stand". The undisputed evidence was up to 10 percent contamination was acceptable. The Moores thus met their burden of proving a "dominant pattern" in the mint oil trade. Official Comment 9, RCWA 62A.1–205; *Hartwig Farms, Inc. v. Pacific Gamble Robinson Co.,* 28 Wn. App. 539, 625 P.2d 171 (1981). There was

also testimony the term "clean", which was not used here, could mean absence of peppermint. The testimony also supports the finding that "good solid stand" means a solid mat of roots. The Schinmanns do not deny they received a solid mat of roots. Substantial evidence supports the trial court. *Holland v. Boeing Co.*, 90 Wn.2d 384, 583 P.2d 621 (1978).

The Schinmanns next contend they timely revoked acceptance of the roots under RCW 62A.2–608. This issue is raised for the first time on appeal; we will not consider it. RAP 2.5(a).

Lastly, the Schinmanns contend mint roots are not "seeds" within the seed lien statute.[1] "Seed" is not statutorily defined. The court may employ dictionaries to determine the meaning of unambiguous statutory terms not otherwise defined. *Garrison v. State Nursing Bd.*, 87 Wn.2d 195, 550 P.2d 7 (1976). *Webster's Third New International Dictionary* 2055 (1969) defines "seed" as

> [a] propagative portion of a plant: as (1): spore (2): a dry seedlike fruit (as a caryopsis or seedball) (3): a vegetative reproductive structure (as a bulb, corm, or tuber) . . .

"[S]eed for growing crops" as set forth in RCW 60.12.180 is a broad term. The mint roots are used to propagate additional mint roots, which result in growing crops. The roots perform the same function as seeds. In construing a statute, the court is to avoid strained or absurd consequences. *Yakima First Baptist Homes, Inc. v. Gray*, 82 Wn.2d 295, 510 P.2d 243 (1973); *State v. Leek*, 26 Wn. App. 651, 614 P.2d 209 (1980). *See also J.R. Simplot Co. v. Vogt*, 93 Wn.2d 122, 605 P.2d 1267 (1980) (court assumed seed lien covered seed potatoes). We hold the statute encompasses mint roots.

The Moores are entitled to attorney fees under the con-

---

[1]RCW 60.12.180 provides:

"Every person who, at the written request of the owner of real property, his agent, or tenant, furnishes seed for growing crops upon such real property shall have a lien for the agreed price or the reasonable value thereof upon any or all crops grown from such seed."

tract. Mr. Crossland is awarded $1,500 and Messrs. Schussler and Menard are awarded $2,500. In lieu of striking their affidavits for failure to comply with RAP 18.1, we impose sanctions of $250 apiece upon Messrs. Crossland, Schussler and Menard, payable to the court.

The judgment is affirmed.

McInturff, A.C.J., and Thompson, J., concur.

Reconsideration denied June 10, 1985.