[Nos. 19647–2–I; 20508–1–I.   Division One.   May 4, 1988.]

EARL MILLER, ET AL, *Appellants*, v. CAROLE BADGLEY, *Respondent*.

*Gary H. Sexton* and *Sexton & Bratt,* for appellants.

*Robert W. Thomas, Carla Tachau,* and *Lane, Powell, Moss & Miller,* for respondent.

SWANSON, J.—Earl and Linda Miller appeal from a judgment awarding damages to Carole Badgley in connection with the sale of a boat. The Millers contend the trial court erred in determining that they breached an implied warranty of merchantability by selling a sailboat with a structural defect in the hull–to–keel connection. In a consolidated appeal, Badgley challenges the trial court's denial of her motion for an award of attorney's fees, costs, and sanctions on a supersedeas matter.

In 1978 the Millers purchased the *Bonnie,* a 44–foot fiberglass sailboat, from Miller Marine, Inc., on Bainbridge Island. Earl Miller was the president and principal stockholder of the company, which specialized in custom–built sailboats.[1] Miller had been in the boat building business before forming Miller Marine in 1977 and is a well known builder, sailor, and boat racer. According to one expert witness, Earl Miller "built the biggest, fanciest fiberglass boats that have ever been built in Seattle . . ."

The *Bonnie* is a relatively lightweight, high–performance racing sailboat, with a deep draft, high rigging, and flush deck, but she is also suitable for cruising. For 3 years, the Millers raced the *Bonnie* in approximately 25 races per year, including the Swiftsure competition out of Victoria, British Columbia.

In 1981 Carole Badgley, who was interested in a Miller 44 saw an advertisement from a boat brokerage company for the *Bonnie.* After viewing the *Bonnie* on Bainbridge Island, Badgley began negotiations with Earl Miller. Badgley told

---

[1]Miller Marine, Inc., which was not a party to this action, was subsequently dissolved.

Miller that she planned to live on the *Bonnie* and use it for ocean cruising. Miller advised her that the boat was suitable and safe for these purposes and that the *Bonnie* was in fact "beefier" in its construction to ensure safety because his family was often on board. Miller also informed Badgley that the *Bonnie* was designed by Peter Hatfield, a noted Canadian designer, but did not tell her that he himself had modified the original plans and that the *Bonnie* "was not a standard Miller 44, by a long shot."

Miller's design modifications included the hull–to–keel connection, an area known as the "tuck," where the hull bends down to meet the top of the keel. This area is subject to substantial stress as a sailboat heels over. Miller, who is not an engineer, did not have the modification analyzed for structural sufficiency, but relied on his "common sense and . . . experience."

On April 6, 1981, the parties executed a sales agreement for the *Bonnie;* the purchase price was $135,200 payable in installments. The agreement, which was drafted by a mutually chosen attorney, provided that Badgley accepted the *Bonnie* "in its present condition." The sale was also subject to a marine survey to be performed at Badgley's option. The survey was performed, the *Bonnie* was pronounced "seaworthy," and Badgley took possession in June 1981. Within several months, Badgley and her son began to race the *Bonnie* regularly. During the next 4 years, Badgley raced the *Bonnie* some 35 times.

Because of a minor but persistent leak, Badgley hired Daniel Mahler, a licensed naval architect and engineer, to analyze the problem. Mahler concluded that the hull–to–keel connection was structurally weak, a deficiency that in his opinion caused excessive flexing and permitted the water to work its way through the hull. Mahler recommended that fiberglass reinforcement be added in the outer tuck area and that additional "floors," rib–like crosspieces, be placed inside the hull at the connection. These repairs were carried out in two stages in 1983 and 1985. Badgley continued to pay the monthly installments pursuant to the

sales contract and eventually paid off all but $6,000 of the purchase price, which she withheld for the structural repairs.

On May 23, 1984, Miller filed the instant lawsuit, seeking to collect the $6,000 due on the underlying promissory note. Badgley counterclaimed, alleging, *inter alia,* that Miller had breached an implied warranty of merchantability. Trial began on September 15, 1986, and focused on Badgley's counterclaim. Mahler testified that engineering calculations—including the "section modulus"—based primarily on standards developed by Lloyd's of London, indicated that the *Bonnie* was built with one–third of the required strength at the hull–to–keel connection. Mahler described the defect as major:

> This is a very high area of stress. The problem typically occurs in an effort to keep weight down and so forth . . . There is a squeeze, and this area becomes weakened. If this continues to flex excessively, it will form a fatigue crack in these areas.
>
> These leaks were in the process of, I believe, much more serious consequences that would have occurred had this vessel gone to sea and been exposed to 24 hour type of sea loadings, tacking, broaching, so forth than can occur when one cruises a boat, and so I view this as a failure as either—the keel literally could fall off the boat, but more likely it would open up in this corner and leak water very heavily, to the point that the vessel would sink.
>
> That's the danger you are trying to prevent when you design and engineer these joints in sailboats.

In response, Miller presented testimony from several experts, including Robert Perry, a noted yacht designer and technical editor for sailing publications. Perry stated that the *Bonnie* complied with ABS (American Bureau of Shipping) standards in the number of floors and that she was structurally safe as designed. Perry acknowledged, however, that his analysis did not involve the "section modulus" of the stiffeners. None of Miller's witnesses was a licensed engineer or naval architect qualified to do the analysis performed by Mahler.

The trial court found that the *Bonnie*'s hull–to–keel connection was defectively designed and inadequate for its intended uses. The court also determined that Miller was a "merchant" within the meaning of the Uniform Commercial Code (U.C.C.) and that he had therefore breached the implied warranty of merchantability. Badgley was awarded about $20,000 in damages for the repairs, $3,000 for loss of use while the boat was being repaired, $8,500 in attorney's fees, and $1,600 in costs. Findings of fact, conclusions of law, and a judgment to this effect were entered on November 13, 1986.

When, as here, the trial court has weighed the evidence, our review is limited to determining whether the trial court's findings are supported by substantial evidence and, if so, whether the findings, in turn, support the conclusions of law and judgment. *Holland v. Boeing Co.*, 90 Wn.2d 384, 390, 583 P.2d 621 (1978). Even where the evidence is conflicting, we need determine only whether the evidence most favorable to the respondent supports the challenged findings. *Thomas v. Ruddell Lease–Sales, Inc.*, 43 Wn. App. 208, 212, 716 P.2d 911 (1986).

Miller initially challenges the trial court's conclusion that he was a "merchant." For purposes of the U.C.C., a "merchant" is defined as a person

> who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction . . .

RCW 62A.2–104(1). The general definition of "merchant," however, does not control all situations. Under RCW 62A.2–314, an implied warranty of merchantability arises only "if the seller is a merchant *with respect to goods of that kind*." (Italics ours.) The definition of merchant is more limited for purposes of RCW 62A.2–314 and requires that one deal regularly in goods of the kind involved in the transaction or otherwise have a professional status such that he or she could be expected to have specialized knowledge or skills peculiar to those goods. *Cropper v. Rego*

*Distrib. Ctr., Inc.*, 542 F. Supp. 1142, 1154 (D. Del. 1982); *see also* Official Comment 2, RCWA 62A.2–104; *Fred J. Moore, Inc. v. Schinmann*, 40 Wn. App. 705, 709, 700 P.2d 754 (1985). The requirements of RCW 62A.2–314 serve to exclude from liability for a breach of an implied warranty of merchantability those merchants who have "only a general knowledge of industry practices". *Cropper*, at 1154.

Whether a person is a merchant for purposes of the U.C.C. is generally "a question of law for the courts to decide by applying the UCC definition of merchant to the facts in the case." 1 R. Anderson, *Uniform Commercial Code* § 2–104:12, at 530 (3d ed. 1981) (quoting *County of Milwaukee v. Northrop Data Sys., Inc.*, 602 F.2d 767 (7th Cir. 1979)). The trial court's finding that Earl Miller, both individually and on behalf of Miller Marine, dealt in goods such as the *Bonnie* and held himself out to Badgley as having professional knowledge and skill regarding sailboats is unchallenged. Earl Miller testified about his extensive skill and experience in the design, construction, and selling of sailboats. Miller was president of Miller Marine, the company that built the *Bonnie* and more than 100 other sailboats in a variety of classes. The evidence was thus overwhelming that Miller had a professional status with regard to the particular goods at issue in the transaction; he was therefore a merchant within the more limited definition of RCW 62A.2–314.

Miller argues that because he and his wife had never personally sold another boat, the sale to Badgley was an "isolated transaction" and thus not subject to the requirements of RCW 62A.2–314. *See* Official Comment 3, RCWA 62A.2–314.[2] The number of transactions alone, however, is not controlling. *See, e.g., Joyce v. Combank/Longwood*, 405

---

[2]*Schinmann*, relied upon by Miller for this proposition, is distinguishable. In *Schinmann*, we held that a farmer who made a one–time sale of mint roots was not a merchant for purposes of RCW 62A.2–314. Our decision rested on the fact that the seller in question had dealt in mint oil, not mint roots, which was the subject of the transaction. Here, Miller had a "professional status" with respect to the specific subject of the transaction.

So. 2d 1358 (Fla. Dist. Ct. App. 1981). Miller built and sold sailboats for a living. He held himself out to Badgley as having professional knowledge and skill in this field. To hold under the circumstances here that Miller was not a merchant merely because the transaction was carried out privately rather than through the corporate entity would be to elevate form over substance.

Miller's primary contention on appeal is that even if he was a merchant, any implied warranties were excluded by paragraph 3 of the sales agreement, which provided that the purchaser accepted the *Bonnie* "in its present condition" and that the sale was subject to a marine survey "insofar as the structural integrity and seaworthiness of the hull" were concerned. *See* RCW 62A.2–316(3)(a);[3] .2–316(3)(b).[4] Because disclaimer of warranty is an affirmative defense, Miller had the burden of proof. *DeCoria v. Red's Trailer Mart, Inc.*, 5 Wn. App. 892, 896, 491 P.2d 241 (1971).

Authority is split on whether the words "in its present condition" are sufficiently similar to the sanctioned words "as is" to constitute a disclaimer of implied warranties pursuant to RCW 62A.2–316(3)(a). *Compare Hull–Dobbs, Inc. v. Mallicoat*, 57 Tenn. App. 100, 415 S.W.2d 344 (1966) ("accepted in its present condition" refers to acceptance and is not synonymous with "as is" or "with all faults") *with Joseph Charles Parrish, Inc. v. Hill*, 173 Ga. App. 97, 325 S.E.2d 595 (1984) (invoice stating buyer accepted auto "in its present condition" clearly signified car sold "as is" and was effective to exclude any implied warranties); *see*

---

[3]RCW 62A.2–316(3)(a) provides: "unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is', 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty[.]"

[4]RCW 62A.2–316(3)(b) provides: "when the buyer before entering into the contract has examined the goods . . . as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him[.]"

*also* 3 R. Anderson § 2–316:83, at 380 (phrase "in its present condition" is equivocal).

Miller also contends that any implied warranties were excluded by the marine survey that Badgley performed prior to taking possession of the *Bonnie*. By examining goods, a buyer waives any implied warranties with regard to defects that such an examination disclosed or reasonably should have disclosed. 3 R. Anderson § 2–316:88, at 382. No waiver occurs, however, if the defect is latent and is one that could not reasonably be discovered during the examination. *See Testo v. Russ Dunmire Oldsmobile, Inc.*, 16 Wn. App. 39, 45, 554 P.2d 349, 83 A.L.R.3d 680 (1976). Whether a reasonable examination should have uncovered the defect is generally a question of fact. 3 R. Anderson § 2–316:89, at 383. The trial court's finding that the survey could not have revealed the defect here is supported by Mahler's testimony. Miller failed to present any evidence at trial challenging the sufficiency of the survey.

We find it unnecessary, however, to determine whether the implied warranty of merchantability was excluded pursuant to RCW 62A.2–316(3). Disclaimers of warranty are not favored in the law. *DeCoria v. Red's Trailer Mart, Inc., supra.* Even if we assume that the term "in its present condition" or the survey constituted a disclaimer, a disclaimer or waiver of warranty is ineffective unless "(1) it is explicitly negotiated between the buyer and the seller, and (2) it sets forth with particularity the qualities and characteristics that are not being warranted." *Thomas v. Ruddell Lease–Sales, Inc., supra* at 213 (citing *Berg v. Stromme*, 79 Wn.2d 184, 196, 484 P.2d 380 (1971)). The second part of this test was codified with respect to consumer transactions in RCW 62A.2–316(4). Enactment of RCW 62A.2–316(4) left unchanged the requirement that the disclaimer be expressly negotiated. *Hartwig Farms, Inc. v. Pacific Gamble Robinson Co.*, 28 Wn. App. 539, 542 n.5, 625 P.2d 171 (1981).

Here, there was no evidence of any negotiations between the parties regarding a disclaimer. Both Miller and Badgley

testified that there were no negotiations regarding any structural deficiency in the hull–to–keel connection. The fact that a mutually chosen attorney drafted the sales agreement is not controlling. Even Badgley's knowledge of the alleged disclaimer would be insufficient to render it effective absent negotiation and agreement. *See Hartwig Farms*, at 545. In addition, paragraph 3 of the sales agreement does not set forth clearly or with particularity the qualities and characteristics being disclaimed. Although there is a reference to a marine survey "insofar as the structural integrity and seaworthiness . . . is concerned," this is in the context of the buyer's optional right to rescind the sale. Thus, the trial court's finding that paragraph 3 of the sales agreement did not constitute a sale "as is" and that there were no negotiations or discussions in this regard is amply supported by the record. Miller fails to address this basis for the trial court's decision.

Miller next challenges the trial court's finding that the *Bonnie* was not merchantable and that Miller therefore breached the implied warranty of merchantability. RCW 62A.2–314(2) provides that to be "merchantable," goods must be at least such as

(a) pass without objection in the trade under the contract description; and

. . .

(c) are fit for the ordinary purposes for which such goods are used; . . .

Whether goods are merchantable necessarily depends on the particular facts of the case. *Tallmadge v. Aurora Chrysler Plymouth, Inc.*, 25 Wn. App. 90, 94, 605 P.2d 1275 (1979). The party asserting the breach of warranty has the burden of proving that the goods were not merchantable. *Seattle Flight Serv. v. Auburn*, 24 Wn. App. 749, 751, 604 P.2d 975 (1979).

In order to be merchantable, goods need not be outstanding or superior; they must, however, be fit for the ordinary purpose for which they are used. *Sessa v. Riegle*, 427 F. Supp. 760, 769 (E.D. Pa. 1977), *aff'd*, 568 F.2d 770

(3d Cir. 1978). Miller passionately maintains that the *Bonnie's* extensive racing history without catastrophic failure belies any contention that she was not merchantable. The trial court, however, found that

> Miller's actual design and construction of the keel–to–hull connection was defective because the strength of the keel to the superstructure was not adequate for normal use or for the intended uses, *i.e.*, living onboard and offshore sailing. The court finds that the fiberglass was adequate. There was a risk that with extended use, the keel–to–hull connection would fail, thereby subjecting those aboard the boat to the risk of drowning.

This finding accurately reflects the testimony of Dan Mahler, the only naval architect and engineer to testify at trial. Whether this court might have weighed the conflicting evidence differently is irrelevant; there was sufficient evidence to support the trial court's finding.[5]

■ Miller next contends that the trial court erroneously failed to calculate damages according to the formula set forth in RCW 62A.2–714(2), which provides:

> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

However, RCW 62A.2–714(2) "is not intended as an exclusive measure." Official Comment 3, RCWA 62A.2–714.

---

[5]In an argument apparently raised for the first time on appeal, Miller maintains that Badgley was required to prove that the *Bonnie* was "unreasonably dangerous" in order to recover for breach of the implied warranty of merchantability. However, while a negative implication of the requirement that goods be fit for ordinary purposes is that they not be unreasonably dangerous, *see Foster v. Ford Motor Co.*, 621 F.2d 715 (5th Cir. 1980), such a showing is not a prerequisite to proving lack of merchantability. *Cf. Salt River Project Agricultural Imp. & Power Dist. v. Westinghouse Elec. Corp.*, 143 Ariz. 368, 694 P.2d 198, 206–07 (1984). Miller also maintains that the trial court failed to enter findings of fact on a material issue, *i.e.*, findings indicating when and under what conditions the *Bonnie's* hull–to–keel connection might fail. This argument, however, merely rephrases Miller's contention that the *Bonnie* was not defective because she had raced for years without a failure in the hull–to–keel connection.

RCW 62A.2–714(1) provides that a buyer who has accepted goods "may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable."[6] Repair costs are an appropriate alternative measure of damages for breach of warranty. *See Lidstrand v. Silvercrest Indus.*, 28 Wn. App. 359, 366, 623 P.2d 710 (1981).

Miller also argues that expenses unrelated to repair of the defect were erroneously included in the trial court's award. A review of the record, however, supports the trial court's calculations.[7]

■ Miller next asserts that the trial court erred in awarding prejudgment interest.[8] The award of prejudgment interest depends on whether the claim is liquidated or unliquidated. *Hansen v. Rothaus*, 107 Wn.2d 468, 472, 730 P.2d 662 (1986). A claim is liquidated "'where the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion.'" *Hansen*, at 472 (quoting *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 442 P.2d 621 (1968)). The fact that a claim is disputed, in part or in whole, does not change the nature of the claim. *Prier*, at 33. Here, the record permitted calculation of the repair costs without reliance on the judge's discretion. Consequently, the trial court did not err in awarding prejudgment interest. *See Prier; North Pac. Plywood, Inc. v. Access Rd. Builders,*

---

[6]Moreover, even under RCW 62A.2–714(2), the cost of repair or replacement is a common measurement of the difference in value as is and as warranted. *See* J. White & R. Summers, *Uniform Commercial Code* § 10–2, at 377 (2d ed. 1980).

[7]Although Miller also assigns error to the trial court's award of $3,000 for Badgley's loss of use of the *Bonnie* during the period of repairs, no argument has been devoted to this issue. These assignments of error are therefore deemed abandoned. *Pappas v. Hershberger*, 85 Wn.2d 152, 153, 530 P.2d 642 (1975).

[8]We can find no indication in the record that this issue was raised below. For example, Miller's post–trial memorandum contains no reference to prejudgment interest.

*Inc.,* 29 Wn. App. 228, 235, 628 P.2d 482, *review denied,* 96 Wn.2d 1002 (1981).

Finally, Miller contends that the trial court erred in awarding Badgley attorney's fees and costs. The trial court based its award on the sales agreement, which provided:

> Should either party bring an action to enforce the terms and conditions of this Agreement, the successful party shall recover reasonable attorney's fees and costs incurred in such an action.

*See also* RCW 4.84.330. Miller first argues that Badgley was not the "prevailing party" in the action. Miller initiated this lawsuit to collect $6,000 due on the underlying promissory note. The trial court rejected that claim, however, finding that Badgley had lawfully withheld payment of the $6,000. *See* RCW 62A.2–717. The trial court then entered judgment in favor of Badgley. Clearly, Badgley was the "prevailing party." *See* RCW 4.84.330; *cf. Burton v. Ascol,* 105 Wn.2d 344, 715 P.2d 110 (1986) (neither side clearly prevailed where both sides recovered similar amounts).

■ Miller also maintains that Badgley's counterclaim cannot be construed as a suit to enforce the terms and conditions of the sales agreement. However, because Miller was a merchant, the warranty of merchantability is an implied term of the sales contract. *See* RCW 62A.2–314. In addition, the terms of the sales agreement were central to the dispute between the parties. *See Western Stud Welding, Inc. v. Omark Indus.,* 43 Wn. App. 293, 716 P.2d 959 (1986).[9]

### BADGLEY'S APPEAL

In a consolidated appeal, Badgley assigns error to the trial court's order denying her motion for attorney's fees,

---

[9]Relying solely on *Nordstrom, Inc. v. Tampourlos,* 107 Wn.2d 735, 733 P.2d 208 (1987), Miller challenges several items apparently awarded by the trial court as costs. However, the *Nordstrom* court does not purport to address the basis for all allowable costs and does not discuss some of the items at issue here. Miller fails to direct any legal argument to the individual items challenged, and we therefore decline to consider the alleged errors.

costs, and sanctions in connection with the supersedeas decision. On December 10, 1986, following entry of the judgment, Miller moved ex parte for an order authorizing supersedeas in a form other than bond. Submitted to the court were the motion itself, signed by Miller's counsel, an attached affidavit, signed by Miller, and copies of the proposed security. The proposed security was a promissory note, secured by a deed of trust encumbering 3 acres of commercial property owned by the Millers. In the affidavit, Miller averred that he and his wife

> are the owners of three acres of real property, plus business structures. The assessed value of said property is $512,000.00. There is currently owing, by way of deed of trust, the sum of $63,665.35. The net value of the property is $448,334.65. Said net value far exceeds the amount of the judgment that remains unsatisfied and unsecured.

On the basis of this submission, the trial court entered an order approving the proposed security. Subsequent investigation by Badgley, however, disclosed prior obligations totaling at least $842,059 that were secured by the same property, well in excess of the value of the property as claimed by Miller. Neither below nor on appeal has Miller disputed Badgley's calculations.

On March 9, 1987 Badgley moved for an order discharging the supersedeas decision and for an award of attorney's fees and costs resulting from the investigation into Miller's alleged misrepresentation. *See* RAP 8.1(e). Badgley's motion rested in part on CR 11. In response, the trial court discharged the initial supersedeas decision, determining that

> the deed of trust is ineffective, the proposed security is inadequate, and that Badgley's judgment against Miller is unprotected at this point. The court further finds that the only acceptable form of supersedeas which will adequately protect Badgley's judgment is a supersedeas bond.

The trial court subsequently denied Badgley's motion for an award of attorney's fees.

Badgley contends that the trial court erred in failing to impose sanctions because both Miller (who signed the affidavit) and his counsel (who signed the motion) violated CR 11. Badgley maintains that Miller and his counsel failed to make a reasonable inquiry into the facts supporting the motion. We agree.

CR 11 provides in pertinent part:

> The signature of a party or of an attorney constitutes a certificate by him that he has read the pleading, motion, or legal memorandum; that to the best of his knowledge, information, and belief, *formed after reasonable inquiry it is well grounded in fact* and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

(Italics ours.) CR 11 was amended in 1985 and contains substantially the same language adopted in 1983 by the federal rules. *See generally Wilson v. Henkle,* 45 Wn. App. 162, 173–74, 724 P.2d 1069 (1986).[10] The amended language was intended to reduce the reluctance of trial courts to impose sanctions "by emphasizing the responsibilities of the attorney and reinforcing those obligations by the imposition of sanctions." Fed. R. Civ. P. 11 advisory committee note, 97 F.R.D. 165, 198 (1983). "The primary effect of the 1983 amendment was the elimination of Rule 11's 'good faith' defense and the creation of a 'reasonable inquiry' duty." 2A J. Moore, *Federal Practice* ¶ 11.02[3], at 11–17 (2d ed. 1987); *see generally* Schwarzer, *Sanctions Under the New Federal Rule 11—A Closer Look,* 104 F.R.D. 181 (1985). The revised rule now imposes an objective, rather

---

[10] One significant difference involves the scope of the rule as adopted in Washington. CR 11 applies to every "pleading, motion, or *legal memorandum*[,]" whereas the federal rule encompasses "every pleading, motion and *other paper* . . ." (Italics ours.) This difference suggests that the Washington rule was intended to apply in fewer circumstances. *See generally* Washington State Bar Ass'n, *Civil Procedure Before Trial Deskbook* § 11 (Supp. 1986). Miller does not maintain that the documents at issue here do not fall within the scope of CR 11.

than a subjective, standard of reasonableness; an attorney's good faith no longer provides a shield against CR 11 sanctions. *See Robinson v. National Cash Register Co.*, 808 F.2d 1119, 1127 (5th Cir. 1987), *overruled in part on other grounds in Thomas v. Capital Sec. Servs.*, 836 F.2d 866 (5th Cir. 1988).

■ Both the federal and state amendments to rule 11 were designed to reduce "delaying tactics, procedural harassment, and mounting legal costs." 3A L. Orland, Wash. Prac., *Rules Practice* § 5141 (3d ed. Supp. 1988). Although the question of sanctions pursuant to revised CR 11 is one of first impression in the Washington appellate courts, rule 11 sanctions in the federal courts have become virtually routine. Because CR 11 was modeled upon and is substantially similar to federal rule 11, we look to the federal courts for guidance in construing CR 11. *See Harding v. Will*, 81 Wn.2d 132, 135 n.2, 500 P.2d 91 (1972).

As amended, CR 11 imposes several independent and affirmative duties on the attorney or party signing the pleading or motion, including (1) the duty to conduct a reasonable inquiry into the facts supporting the motion; (2) the duty to conduct a reasonable inquiry into the law, such that the motion is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and (3) the duty not to interpose the motion for purposes of delay, harassment, or increasing the costs of litigation. *Cf. Robinson v. National Cash Register Co., supra; Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1174 (D.C. Cir. 1985).

■ In determining whether factual reasons exist for imposing sanctions, the trial court must be accorded wide discretion: "[The trial court] has tasted the flavor of the litigation and is in the best position to make these kinds of determinations." *Westmoreland*, at 1174. However, under amended CR 11, the trial court's exercise of discretion is now directed more to the nature and scope of sanctions rather than to their initial imposition. Once a violation occurs, imposition of sanctions is mandatory:

> If a pleading, motion, or legal memorandum is signed in violation of this rule, the court, upon motion or upon its own initiative, *shall impose* upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading . . .

(Italics ours.) *See also Westmoreland,* at 1174–75; *Thomas v. Capital Sec. Servs., supra.*

Given the inherent tension between the trial court's considerable discretion in ascertaining rule 11 violations and the mandatory nature of sanctions once a violation has been established, it is not surprising that the federal courts are split regarding the appropriate standard of review to apply to the trial court's decision to impose or deny sanctions. Some courts have adopted a 3–tiered approach that turns upon the aspect of the trial court's decision being reviewed: "(1) factual determinations are reviewed for clear error; (2) the legal conclusion that the facts establish a violation is reviewed de novo; and (3) the appropriateness of the sanction imposed is reviewed for an abuse of discretion." *United Energy Owners Comm., Inc. v. United States Energy Management Sys.,* 837 F.2d 356, 364 (9th Cir. 1988). Other courts have adopted an across–the–board abuse of discretion standard. *See generally Thomas v. Capital Sec. Servs., supra* at 871–73 and cases cited therein. For purposes of our decision, however, we need not determine the appropriate standard of review because we conclude there was a CR 11 violation as a matter of law.

The primary issue is whether Miller's motion for supersedeas in a form other than bond was based upon a reasonable inquiry into the facts. Whether or not a reasonable inquiry has been made depends on the circumstances of a particular case. Factors that the trial court may consider include the time that was available to the signer, the extent of the attorney's reliance upon the client for factual support, whether a signing attorney accepted a case from another member of the bar or forwarding attorney, the

complexity of the factual and legal issues, and the need for discovery to develop factual circumstances underlying a claim. *See Thomas v. Capital Sec. Servs., supra; see also* advisory committee note, *supra,* at 199. An attorney's "blind reliance" on a client, however, will seldom constitute a reasonable inquiry. *Southern Leasing Partners, Ltd. v. McMullan,* 801 F.2d 783, 788 (5th Cir. 1986); *cf. Coburn Optical Indus. v. Cilco, Inc.,* 610 F. Supp. 656, 659 (M.D.N.C. 1985) ("If all the attorney has is his client's assurance that facts exist or do not exist, when a reasonable inquiry would reveal otherwise, he has not satisfied his obligation.")

In the instant case, the trial court, in discharging its prior supersedeas decision, found that the deed of trust was "ineffective," the proposed security was "inadequate," and that Badgley's judgment was "unprotected." Miller does not challenge these findings.[11] Nor does Miller take issue with the evidence showing almost $900,000 of prior encumbrances on the property that was to secure Badgley's judgment. Moreover, the facts necessary to support the motion at issue here were not complex, were relatively easy to ascertain, and were within the moving party's control. We cannot find in the record even an allegation that counsel or client made *any* inquiry into the factual basis for the motion. *Cf. Mohammed v. Union Carbide Corp.,* 606 F. Supp. 252, 261 (E.D. Mich. 1985) (a "reasonable inquiry" at the very least requires some affirmative investigation).

Under these circumstances, it is irrelevant whether Miller simply forgot about $800,000 in debt or intentionally misstated the facts to the court. A reasonable inquiry would have disclosed the obvious inadequacy of the proposed security. *Cf. Cabell v. Petty,* 810 F.2d 463, 466 (4th Cir. 1987). Consequently, the trial court erred in determining

---

[11]Because the record here was adequate for purposes of review, we need not discuss the circumstances in which specific findings and conclusions might be necessary. *See generally Thomas v. Capital Sec. Servs., supra* at 882–83.

that no CR 11 violation occurred.[12] Miller's primary contention on appeal is that the trial court entered no finding that his original affidavit was made in bad faith. However, one who signs a motion can no longer avoid CR 11 sanctions merely by claiming good faith conduct or personal ignorance of the groundless nature of a claim. *See Eastway Constr. Corp. v. New York*, 762 F.2d 243, 253 (2d Cir. 1985).

Our determination that CR 11 was violated, however, does not automatically entitle Badgley to an award of attorney's fees. While imposition of some sanction is mandatory, the trial court retains broad discretion to tailor an "appropriate sanction" and to determine against whom such a sanction should be imposed. *See* advisory committee note, *supra.* Although CR 11 expressly provides for the award of reasonable expenses caused by the violative motion, such an award does not exhaust the options available to the trial judge. In some instances, a reprimand from the court will be sufficient. *See* Schwarzer, at 201; *see also Huettig & Schromm, Inc. v. Landscape Contractors Coun.*, 582 F. Supp. 1519 (N.D. Cal. 1984) (in addition to monetary sanctions, trial court directed that opinion criticizing lawyer's pleadings be circulated throughout his firm), *aff'd*, 790 F.2d 1421 (9th Cir. 1986). Moreover, CR 11 authorizes only the award of reasonable attorney's fees. A party resisting a motion that violates CR 11 has a duty to mitigate and may not recover excessive expenditures. *See generally Thomas v. Capital Sec. Servs., supra.*

In fashioning an appropriate sanction, the trial judge must of necessity determine priorities in light of the deterrent, punitive, compensatory, and educational aspects of sanctions as required by the particular circumstances. *See Lieb v. Topstone Indus.*, 788 F.2d 151, 158 (3d Cir. 1986).

---

[12]Although the trial court did not expressly rule on the CR 11 issue, this conclusion is implicit in its denial of Badgley's motion for sanctions. However, to the extent the trial court might have believed that a CR 11 violation occurred, but decided that sanctions were not warranted, its decision was also erroneous.

"The basic principle governing the choice of sanctions is that the least severe sanctions adequate to serve the purpose should be imposed." Schwarzer, at 201; *Thomas v. Capital Sec. Servs., supra* at 878. Resolution of these matters lies within the informed discretion of the trial court.

Pursuant to RAP 18.1 and the sales contract, Badgley is entitled to reasonable attorney's fees on appeal. However, Badgley's affidavit encompasses expenses related both to her defense of Miller's appeal and to her own appeal from the supersedeas decision. Consequently, we remand the matter to the trial court for calculation of reasonable attorney's fees on appeal in light of the trial court's determination of sanctions. We decline to impose sanctions or award attorney's fees pursuant to RAP 18.9 for a frivolous appeal or an appeal taken merely for delay.

The judgment in favor of Badgley is affirmed; we remand only for calculation of reasonable attorney's fees. The order denying sanctions is vacated and the matter remanded for determination and imposition of appropriate sanctions.

PEKELIS, J., and RINGOLD, J. Pro Tem., concur.

Review denied by Supreme Court September 1, 1988.