Carl O. CARLSON, Jr.,
Appellant (Plaintiff),

v.

E. Leva CARLSON and Citizens National Bank & Trust Company, a national bank, Appellees (Defendants).

No. 88–237.

Supreme Court of Wyoming.

June 2, 1989.

Raymond W. Martin, Godfrey, Sundahl & Jorgenson, Cheyenne, for appellant.

Raymond B. Hunkins, Jones, Jones, Vines & Hunkins, Wheatland, for appellee, E. Leva Carlson.

Frank J. Jones, Wheatland, for appellee, Citizens Nat. Bank & Trust Co.

Before THOMAS, MACY and GOLDEN, JJ., BROWN, J., Retired, and LEIMBACK, District Judge.

THOMAS, Justice.

In this case, the court is asked to resolve the question of whether an ambiguity exists in two farm leases and an agreement providing for improvements to the farm by the tenant, considered separately or collectively, which inhibits the construction of the documents as a matter of law. Inherent to this problem is the issue of whether any ambiguity serves to structure a genuine issue of material fact with the result that deciding the case by summary judgment would be inappropriate. The district

court entered a summary judgment in favor of the landlord, ruling that the documents "read separately or in conjunction with each other, are clear and unambiguous." A summary judgment also was entered in favor of a bank that was a creditor of the landlord on the ground that the bank's actions did not interfere with the contractual relationship between the tenant and the landlord, or that the bank's actions were justified by its economic interest. The court is convinced that an ambiguity is present in the documents, which presents a genuine issue of material fact as to the intent of the parties, and that genuine issues as to other material facts require a trial in this case. The summary judgment entered by the district court is reversed, and the case is remanded for trial.

The case was instituted by Carl O. Carlson, Jr. (Carl Carlson), the tenant in the relationship, alleging a contractual right to an option; breach of that contract by his mother, E. Leva Carlson (Leva Carlson), the landlord in the relationship; wrongful interference with the contractual relationship by the Citizens National Bank & Trust Company (Citizens Bank); and a conspiracy between Leva Carlson and Citizens Bank and between Citizens Bank and Leva Carlson. Carl Carlson sought damages, punitive damages, and a declaratory judgment with respect to his rights under the instruments. He did make an appropriate demand for a jury trial.

Leva Carlson answered, denying those allegations of Carl Carlson's complaint upon which relief to him could be based, presenting affirmative defenses, and counterclaiming for damages for slander of title; wrongful interference with her contract for the listing of the farm for sale; the chilling of her sale of the farm; emotional distress; and economic loss for breach of the lease. Leva Carlson also alleged that the contractual provisions controlled the relationship of the parties, and she also sought a declaratory judgment of the rights under the instruments. Citizens Bank answered, denying liability upon any of the grounds for recovery asserted in Carl Carlson's complaint, and it pleaded affirmative defenses including its good faith protection of its economic interest.

Following Carl Carlson's answer to Leva Carlson's counterclaims, in which he denied liability under any of the theories asserted by her, discovery was conducted. Then Defendant Citizens National Bank & Trust Co. filed its Motion for Summary Judgment. Several days later, Defendant E. Leva Carlson's Motion for Partial Summary Judgment was presented. About the same time, Carl Carlson moved to amend his complaint, and the court ultimately permitted the amendment.

At this juncture, the case was interrupted by the proceedings reflected in *Carlson v. Langdon*, 751 P.2d 344 (Wyo.1988). Then, following Carl Carlson's resistance to the respective motions for summary judgment, Citizens Bank filed a Supplemental Motion for Summary Judgment. The court wrote a decision letter, and entered Summary Judgments in favor of Leva Carlson and Citizens Bank and a Summary Judgment Order Nunc Pro Tunc. Carl Carlson now appeals the court's findings.

In his Brief of Appellant, Carl Carlson offers this statement of the issues:

"I. Issues Pertaining to Appellee E. Leva Carlson:

"1. Did the 1973 Agreement between Appellee E. Leva Carlson (hereinafter Leva) and Appellant Carl O. Carlson (hereinafter Carl) create merely a nonbinding 'improvement agreement', or did the parties to the contract intend to provide for an exclusive binding purchase option and lifetime lease?

"2. Does an ambiguity exist in the 1973 agreement?

"3. Does the doctrine of estoppel intervene to preclude Leva Carlson's denial of her oral and written intentions to grant to Carl Carlson a lifetime lease with an exclusive option to purchase the farm upon her death?

"II. Issues Pertaining to Appellee Citizens National Bank and Trust Company:

"1. Is it necessary to find a valid contractual relationship between Leva and Carl Carlson in order to support an alle-

gation of tortious interference with contractual relations?

"2. Can Citizens National Bank and Trust Company's (hereinafter CNB) actions be classified as justifiable under a theory of economic justification?"

In the Brief of Appellee submitted by Mrs. E. Leva Carlson, the following counterstatement of the issues appears:

"1. Are each of the three agreements involved in this case, considered separately, clear and unambiguous?

"2. If each of the three agreements, considered separately, are clear and unambiguous, are they inconsistent or mutually exclusive of each other?

"3. If both the 1973 agreement and the 1985 lease agreement are clear and unambiguous, and are not inconsistent or mutually exclusive, did the trial court correctly apply their provisions by holding that Mrs. Carlson had a right to' terminate the lease and sell her farm?"

In the Brief of Appellee submitted by Citizens Bank, only one issue is stated as follows:

"Did the district court judge err in granting summary judgment to Citizens National Bank & Trust Co.?"

The dispute centers around a lease arrangement for the family farm entered into by Carl Carlson and his wife, as operators, and, initially, his father and his mother, Leva Carlson, as owners. The family moved to this farm when Carl Carlson was nine years old, and he lived there until he finished high school in 1954. He then left home to work at the Guernsey coal mine. In 1959, Carl Carlson was married, but he continued to contribute time to assisting with the farm from 1959 to 1967. In 1966, Carl Carlson's father quit farming because he was afflicted with multiple sclerosis. Carl Carlson's brother then operated the farm through 1969, but his skills were not suited to that effort. Since 1969, and up until this litigation, Carl Carlson has operated the farm continuously.

In 1970, Carl Carlson and his wife entered into a written lease with his father and his mother, Leva Carlson. That lease continued in existence until 1985, pursuant to its provision that:

"This AGREEMENT to remain effective from year to year unless notice of termination is received by the operator [Carl O. Carlson, Jr., and Carol J. Carlson] at least 60 days prior to the end of crop year."

In 1973, an agreement was made between Carl Carlson and Leva Carlson which provided for the development of improvements on the farm. The recited consideration for Leva Carlson's promises was the improvements which were to be made by Carl Carlson. In addition, Carl Carlson agreed to pay any increase in real property taxes attributable to those improvements. That 1973 agreement identified Leva Carlson as the FIRST PARTY and Carl Carlson as the SECOND PARTY and provided, in critical part, as follows:

"3. In the event of the death of the FIRST PARTY, for and in consideration of the improvements placed upon the premises by the SECOND PARTY, the FIRST PARTY does hereby give and grant unto the SECOND PARTY an exclusive option to purchase the above described real property, together with any and all improvements thereon, for the total purchase price of $76,425.00, which option shall be exercised as follows:

\* \* \* \* \* \*

"4. In the event that the SECOND PARTY shall suffer death, become incapacitated or for any reason cease to rent the above described property, the above described option shall terminate and be cancelled and the value of said improvements placed upon the premises shall be evaluated and payment made by the FIRST PARTY to the SECOND PARTY as follows:"

\* \* \* \* \* \*

This 1973 agreement encompassed a specific description of the farm property, which had not been included in the 1970 lease. In addition, the agreement contained the following language:

" \* \* \* WHEREAS, the FIRST PARTY is the owner of certain real property, hereinafter described, which she leases

and intends to continue to lease to the SECOND PARTY, * * *."

The lease which was entered into in July of 1985 also included the same description of the premises found in the 1973 agreement. It specifically provided, in parts that are pertinent to this dispute, as follows:

"If lease is not renewed Lessee has the right to plant previous years summer fallow to spring crop and harvest it.

\* \* \* \* \* \*

"This lease will automatically renew annually on March 1 of each year unless either party gives written notice to the other party on or before January 1 of their intention to terminate the lease."

Leva Carlson was indebted to Citizens Bank and, sometime prior to March of 1985, the bank became concerned about collecting the debt. It proposed that Leva Carlson should either execute a mortgage of the real estate to the bank; refinance her debt with another institution and pay the bank; or sell the farm and pay the bank. She did execute a mortgage to the bank in March of 1985 and, thereafter, the lease with Carl Carlson was executed. Then, Citizens Bank demanded that the loan be satisfied in full by February of 1987 and, once again, offered the proposal that Leva Carlson should sell the property and apply the proceeds toward her debt. Because the 1973 agreement appeared to constitute a cloud on the title of Leva Carlson, a decision was made that the lease should be terminated and, in 1986, Leva Carlson advised Carl Carlson that she would terminate the lease as of March 1, 1987. The assumption in connection with the termination of the lease was that the option was abrogated because the termination of the lease invoked that part of the 1973 agreement which provided:

"4. In the event that the SECOND PARTY shall * * * for any reason cease to rent the above described property, the above described option shall terminate * * *."

This was the interpretation that the district court accepted in entering the summary judgment in this case.[1]

While the district court addressed the interpretation of these three instruments as separate documents or, alternatively, as documents to be read in conjunction with one another, it is clear that the agreement between Carl Carlson and Leva Carlson did consist of more than one document which is subject to construction as an integrated document according to our precedent. *Hensley v. Williams,* 726 P.2d 90 (Wyo. 1986); *Dawson v. Lohn,* 705 P.2d 853 (Wyo.1985); *Marcam Mortgage Corporation v. Black,* 686 P.2d 575 (Wyo.1984); *Busch Development, Inc. v. City of Cheyenne,* 645 P.2d 65 (Wyo.1982); *Allen v. Allen,* 550 P.2d 1137 (Wyo.1976). The 1973 agreement alludes to the fact that the property is leased by Leva Carlson to Carl Carlson. The only document relating to such a lease was the 1970 lease agreement. While the 1985 lease does not specifically allude to the 1973 agreement, the identical real property is described. When separate documents, such as these, relate to the rights of the same parties in the same property, it is appropriate that they be treated as one agreement and construed as such.

In the context of a summary judgment relating to a contract dispute, if ambiguity results in any doubt about the meaning of a written instrument, an issue of fact is present to be tried, and summary judgment is inappropriate. See *Shauers v. Board of County Commissioners of Sweetwater County,* 746 P.2d 444 (Wyo.1987); *Weaver v. Blue Cross–Blue Shield of Wyoming,* 609 P.2d 984 (Wyo.1980); *Meuse–Rhine–Ijssel Cattle Breeders of Canada Ltd. v. Y–Tex Corporation,* 590 P.2d 1306 (Wyo. 1979). Conversely, a summary judgment

---

1. This record, indeed, engenders sympathy for both Carl and Leva Carlson. Having devoted more than twenty years to managing and assisting in the operation of the family farm, Carl Carlson was confronted with the loss of his expectation to continue operating the farm. This expectancy had both economic and senti-mental value for him. Leva Carlson had no income other than a social security pension and her share of the farm income, which did not always meet the obligations she owed with respect to the farm. Her lifestyle in her declining years is aptly described as bleak.

appropriately may be entered when the only issue involves the construction of a written agreement clearly expressing the intention of the parties. *J & M Investments v. Davis*, 726 P.2d 96 (Wyo.1986); *Ricci v. New Hampshire Insurance Company*, 721 P.2d 1081 (Wyo.1986); *Wyoming Game & Fish Commission v. Mills Company*, 701 P.2d 819 (Wyo.1985); *Kuehne v. Samedan Oil Corporation*, 626 P.2d 1035 (Wyo.1981); *Madison v. Marlatt*, 619 P.2d 708 (Wyo.1980).

■ This summary judgment rule dovetails with our general proposition that the construction of a contract is a matter of law for the court if the terms of the agreement are clear. *Milligan v. Big Valley Corporation*, 754 P.2d 1063 (Wyo.1988); *Nelson v. Nelson*, 740 P.2d 939 (Wyo.1987); *Wyoming Recreation Commission v. Hagar*, 711 P.2d 402 (Wyo.1985); *Kelliher v. Herman*, 701 P.2d 1157 (Wyo.1985); *Hursh Agency, Inc. v. Wigwam Homes, Inc.*, 664 P.2d 27 (Wyo.1983); *Rouse v. Munroe*, 658 P.2d 74 (Wyo.1983); *Tate v. Mountain States Tel. & Tel. Company*, 647 P.2d 58 (Wyo.1982); *Amoco Production Company v. Stauffer Chemical Company of Wyoming*, 612 P.2d 463 (Wyo.1980); *Engle v. First National Bank of Chugwater*, 590 P.2d 826 (Wyo.1979). If, however, the meaning of the contract is ambiguous or not apparent, making it necessary to determine the intention of the parties from evidence other than the contract itself, interpretation then becomes a mixed question of law and fact. *Mobile Coal Producing, Inc. v. Parks*, 704 P.2d 702 (Wyo.1985); *Worland School District v. Bowman*, 445 P.2d 364 (Wyo.1968), dismissed on appeal after remand 531 P.2d 889 (Wyo.1975); *Goodman v. Kelly*, 390 P.2d 244 (Wyo. 1964). In applying these rules, the question of whether there is an ambiguity is a question of law. *Hensley; Kelliher; Burk v. Burzynski*, 672 P.2d 419 (Wyo.1983); *Hursh; Amoco.*

■ In this instance, we are persuaded that an ambiguity is present when these instruments are scrutinized as one agreement. We cannot find assurance as to what the parties intended from the face of the documents, and the other evidence submitted in connection with the consideration of the motions for summary judgment demonstrates genuine issues as to whether the parties intended the lease to be terminable at the option of Leva Carlson. If Carl Carlson did not have a continuing right to lease this farm, then the option granted to him in the 1973 agreement truly is illusory. We do not favor, and avoid, a construction of a contract rendering a provision thereof meaningless because each provision is presumed to have some purpose. *Wyoming Game and Fish Commission; Kuehne; Tri–County Elec. Ass'n, Inc. v. City of Gillette*, 584 P.2d 995 (Wyo.1978).

Of more significance is our rule that a contract is ambiguous which is obscure in its meaning because of indefiniteness of expression or because of the presence of a double meaning. *Farr v. Link*, 746 P.2d 431 (Wyo.1987); *Rouse*, 658 P.2d 74; *Busch*, 645 P.2d 65; *Amoco*, 612 P.2d 463; *Y–Tex Corporation*, 590 P.2d 1306; *Bulis v. Wells*, 565 P.2d 487 (Wyo.1977). We note that the 1973 agreement expresses an intent on the part of Leva Carlson to continue to lease to Carl Carlson. That intention is expressed even though the then existing agreement for the lease of the farm apparently contemplated a notice of termination from the owner to the operator. Furthermore, it is impossible to tell whether the provision for a written notice to terminate the lease in the 1985 lease was intended to provide for termination, thereby invalidating the option, in the unfettered discretion of Leva Carlson. Affording Leva Carlson that control would make her promise of an option in favor of Carl Carlson illusory.

The contention of Leva Carlson is that her right to terminate the lease under the 1985 agreement triggers the language of paragraph four of the 1973 agreement, in effect invoking the termination and cancellation of the option, because Carl Carlson ceased to rent the property "for any reason." In Webster's Third New International Dictionary (1971), the verb "rent" in its transitive form connotes "to take and hold under an agreement to pay rent: pay rent

for" or "to grant the possession or enjoyment of for rent: hire out." In its intransitive form, the verb "rent" means "to obtain the possession and use of a place or article for rent" or "to allow the possession and use of for rent." The word itself possesses a double meaning. In the context of paragraph four of the 1973 agreement, the phrase "to rent" with Carl Carlson as the subject relates to events that he, not Leva Carlson, would in some manner control. The notion that the right to terminate set forth in the 1985 lease agreement adjusts the meaning of the 1973 agreement, in this regard, manifests ambiguity.

The summary judgment in favor of Leva Carlson entered by the trial court must be reversed. Under the cases cited above, ambiguity is present with respect to the meaning of the contract between the parties as represented by the three separate documents. That creates a genuine issue of fact as to what these parties intended with respect to the right of Leva Carlson to terminate the lease and its impact upon the option granted to Carl Carlson to purchase upon Leva Carlson's death. This question of intent is material and must be adjudicated by the finder of fact which, in this instance, is a jury.

The summary judgment in favor of Citizens Bank also must be reversed. In its decision letter, the district court articulated two justifications for that summary judgment. The first was that an option in favor of Carl Carlson did not exist and, for that reason, the bank could not interfere with such a contractual relationship. The district court also said that any advice furnished by the bank to Leva Carlson could not be construed as interference if made by the bank for the purpose of collecting its own debt and, in effect, the district court found that the bank acted only for the purpose of collecting its own debt.

■ In its brief, Citizens Bank correctly articulates the elements of a claim of tortious interference with a contract. *In Board of Trustees of Weston County School District No. 1 v. Holso*, 584 P.2d 1009, 1016–17, reh. denied 587 P.2d 203 (Wyo.1978), we said that those are:

"(1) [T]he existence of a valid contractual relationship or business expectancy;

"(2) knowledge of the relationship or expectancy on the part of the interferor;

"(3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and

"(4) resultant damage to the party whose relationship or expectancy has been disrupted."

These elements have been applied in *Toltec Watershed Improvement District v. Johnston*, 717 P.2d 808 (Wyo.1986); *Erickson v. Magill*, 713 P.2d 1182 (Wyo.1986); *Dehnert v. Arrow Sprinklers, Inc.*, 705 P.2d 846 (Wyo.1985); *Basin Electric Power Cooperative—Missouri Power Project v. Howton*, 603 P.2d 402 (Wyo.1979). In *Toltec*, 717 P.2d at 814, we adopted language from the Restatement (Second) of Torts § 766 at 26–27 (1979), when we said:

"Factors to be considered for the action are listed as follows:

" 'In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

" '(a) the nature of the actor's conduct,

" '(b) the actor's motive,

" '(c) the interests of the other with which the actor's conduct interferes,

" '(d) the interests sought to be advanced by the actor,

" '(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

" '(f) the proximity or remoteness of the actor's conduct to the interference and

" '(g) the relations between the parties.' "

■ Since we hold that the option of Carl Carlson cannot be disposed of as a matter of law but, instead, involves questions of fact, the determination of the district court, as a matter of law, that there was no contract to be interfered with must fall. Our general rule is that, in reviewing a summary judgment, we examine the record in the light most favorable to the

party opposing the motion and give to that party all the favorable inferences that might be drawn from the facts in the record. E.g., *Fiscus v. Atlantic Richfield Company,* 773 P.2d 158 (Wyo.1989); *Spurlock v. Ely,* 707 P.2d 188 (Wyo.1985); *Minnehoma Financial Company v. Pauli,* 565 P.2d 835 (Wyo.1977); *Shrum v. Zeltwanger,* 559 P.2d 1384 (Wyo.1977). Our examination of this record persuades us that there are facts from which the finder of fact might infer that the 1973 agreement did, as a matter of valid contract, create an option in Carl Carlson not subject to revocation at the discretion of Leva Carlson; Citizens Bank knew of the 1973 agreement and the effect of it; Citizens Bank was instrumental in causing Leva Carlson to insist upon the new 1985 lease and then the termination of the lease with the purpose of eliminating the option so as to create a clear title in Leva Carlson; in light of the value of the farm and the amount of the indebtedness to the bank, this course of action was not necessary and, certainly, could result in damages to Carl Carlson, not only in the loss of his option, but incidental damages as well. We also are persuaded that the summary judgment in favor of Citizens Bank cannot be sustained as a matter of law on the premise of its privilege to protect its economic interest. First, Citizens Bank must establish that it has an economic interest needing protection. Then, it must demonstrate that its actions, including what otherwise could be found to be tortious interference with Carl Carlson's contract, were taken in good faith and were reasonably justified for the purpose of protecting its economic interest. *Toltec,* 717 P.2d at 813–15; *Wartensleben v. Willey,* 415 P.2d 613 (Wyo.1966). This defense of protecting an economic interest is, in substance, an affirmative defense as to which Citizens Bank has the burden of proof. See *Miller v. Badgley,* 51 Wash.App. 285, 753 P.2d 530 (1988). See also *DeCoria v. Red's Trailer Mart, Inc.,* 5 Wash.App. 892, 491 P.2d 241 (Wash.App.1971). After affording Carl Carlson the benefit of all favorable inferences, we conclude that Citizens Bank has not sufficiently carried its burden of demonstrating a prima facie case that justified its summary judgment. Considering the factors articulated in Restatement (Second) of Torts § 766, in conjunction with these propositions, the claims against Citizens Bank cannot be decided as a matter of law but must be submitted to the jury for its determination.

The Summary Judgment Order Nunc Pro Tunc entered by the district court is reversed, and the case is remanded for further proceedings in accordance with this opinion.