

**FILED**

Jul 23 2013, 6:19 am

*Kevin S. Smith*

**CLERK**

of the supreme court,
court of appeals and
tax court

## FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**JEFFREY O. MEUNIER**
Carmel, Indiana

ATTORNEY FOR APPELLEE:

**S. GREGORY ZUBEK**
Whitham Hebenstreit & Zubek LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| GARED HOLDINGS, LLC, | ) | |
| | ) | |
| Appellant-Plaintiff/Counterdefendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1210-PL-811 |
| | ) | |
| BEST BOLT PRODUCTS, INC., | ) | |
| | ) | |
| Appellee-Defendant/Counterclaimant. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Heather A. Welch, Judge
Cause No. 49D12-0909-PL-41784

**July 23, 2013**

**OPINION - FOR PUBLICATION**

**CRONE, Judge**

**Case Summary**

Gared Holdings, LLC ("Gared"), approached Best Bolt Products, Inc. ("Best Bolt"), to see whether Best Bolt could supply pulleys for use in basketball goal systems that Gared manufactures. Gared provided Best Bolt with samples of the pulleys that it had been using, but also indicated that there were problems with those pulleys. Gared did not provide detailed specifications to Best Bolt and did not specifically request a lubricated bushing, a cylindrical part that fits between the wheel and axle to reduce friction. Best Bolt produced some samples, and Gared had some testing performed on the pulleys, but did not discover that the pulleys lacked a lubricated bushing. The lack of lubrication caused the pulleys to seize up soon after the basketball goals were sold.

Gared sued Best Bolt on several theories, including breach of contract, breach of the implied warranty of fitness for a particular purpose, and breach of the implied warranty of merchantability. Best Bolt filed a counterclaim seeking payment for a second order of pulleys and an order of clevis pins, which Gared had refused to accept. The trial court ruled in Best Bolt's favor on each of Gared's claims and on Best Bolt's counterclaim. Gared now appeals.

Gared had argued that the parties' contract required Best Bolt to replicate the samples that Gared provided to Best Bolt, and the trial court rejected that argument. The evidence favorable to the judgment reflects that Gared informed Best Bolt that it was having problems with the pulleys that it was using at the time. From this, it is reasonable to infer that Gared did not want or expect duplicates of the sample pulleys. Regarding the warranty of fitness for a particular purpose, the trial court found that Gared had not

established that it relied on Best Bolt's skill or judgment in producing a pulley that was appropriate for use in the basketball goal systems. The evidence favorable to the judgment reflects that Gared was aware that the pulleys should have a lubricated bushing and simply assumed that Best Bolt would include one in its design. We conclude that the evidence supports the trial court's judgment on these two issues.

The trial court concluded that the warranty of merchantability did not apply because Best Bolt was not a merchant of pulleys. The trial court found that Best Bolt was a distributor rather than a manufacturer and had made only one sale of pulleys. We conclude that the fact that Best Bolt was not a manufacturer is not relevant to the issue of whether it was a merchant. Also, the undisputed evidence shows that Best Bolt made two sales of pulleys and was willing to continue selling pulleys. We conclude that these facts indicate that Best Bolt is a merchant with a relatively new product rather than a non-merchant seller making an isolated sale. Because the evidence is in conflict and the trial court did not reach the issue, we remand for the trial court to determine whether Best Bolt breached the warranty of merchantability. Depending on the trial court's resolution of this issue, it may also be necessary to reconsider the ruling on Best Bolt's counterclaim. Therefore, we affirm in part and remand.

**Facts and Procedural History**

Best Bolt primarily sells fasteners, such as "bolts, nuts and screws and miscellaneous hardware items." Tr. at 115. Best Bolt is a distributor; it does not manufacture the products that it sells. Sometime in 2006, Curtis Sparks, a salesman for Best Bolt, noticed that Gared had playground equipment outside its facility and thought

3

that Gared could be a potential customer. Sparks stopped in and introduced himself. He was directed to Lori Turner, a purchasing manager who is responsible for ordering parts that Gared uses in the products that they manufacture. Sparks began stopping in every four weeks in hopes of establishing a business relationship with Gared. Gared eventually placed orders for cable clamps, clevis pins, and D rings.

At issue in this case are two orders that Gared placed for pulleys. Gared uses pulleys in the basketball goal systems that it manufactures. The basketball goals are designed to hang from the ceiling and can be raised and lowered. The facts favorable to the judgment reflect that, during one of Sparks's regular sales calls in 2006, Turner asked him if Best Bolt could supply pulleys. Turner indicated that their current supplier, Inventory Sales, was going to raise the price, and she was hoping to find a less expensive pulley. Turner also indicated that there was a problem with cables slipping off the wheel and becoming lodged between the wheel and the side plate. Turner provided samples pulleys in two sizes, #3 and #5. Sparks told Turner, "I'll see what I can do." *Id*. at 129. Sparks did not tell Turner that neither he personally nor Best Bolt generally had ever sold pulleys before.

Sparks requested a drawing, but Turner indicated that they did not have one. Gared did not provide detailed specifications for the pulleys, but did indicate that the #5 pulleys needed to be rated at 1550 pounds, withstand a standard pull test of 8000 pounds, and withstand a side pull test of 5000 pounds. At some point during the design process, Gared also requested that the pulleys be fastened together with nylocks rather than rivets.

4

Best Bolt decided to source the pulleys through Dakota Engineering, which would manufacture the pulleys in China. The sample pulleys from Gared were sent to Dakota's engineer in China, who sent back a sample. Joe Connerly, the engineering manager for Gared, examined the samples, measured the diameter, and looked for a proper gap between the wheel and side plate. He did not take the samples apart because they "appeared to be correct." *Id.* at 191. Although he could not tell for sure without taking the pulley apart, he believed that the pulley contained a lubricated bushing because there was a small gap on each side of the wheel between the wheel and the side plate. However, the sample pulleys did not actually have a bushing.

Gared then sent the samples to St. Louis Labs, which performed the standard pull and side pull tests. The standard pull test involves pulling down on the pulley to see how much weight it takes to destroy the pulley. The side pull test is designed to determine how much force it takes to pull the pulley apart from the sides. The sample pulleys exceeded the minimum requirements that Gared had set for each test.

On June 27, 2007, after receiving the test results, Turner placed an order with Best Bolt for 4995 #5 pulleys. On April 14, 2008, Turner placed an order for 2000 #3 pulleys and an additional 5000 #5 pulleys. The purchase order requested that Best Bolt send samples of each for testing, although it is unclear whether Best Bolt sent the samples and, if so, whether Gared had any testing done.

In the fall of 2008, one of Gared's customers reported that a basketball goal had fallen part way to the floor. Connerly examined the goal system and determined that the pulley had stopped turning. Because the pulley was not moving with the cable, the cable

5

eventually became frayed and snapped. Connerly took the pulley apart and realized for the first time that the pulley did not have a bushing and was not lubricated in any way. Without any lubrication, the wheel and axle had become "frozen" together. *Id*. at 194. Connerly conducted a cycling test on two Best Bolt pulleys, which involves repeatedly lifting and lowering a load. The pulleys each seized up after twenty-one cycles.

Gared contacted Best Bolt about the problem, and Best Bolt proposed applying a spray lubricant to the pulleys. Connerly felt that this solution was inadequate because there was no guarantee that the spray could be accurately applied to the axle, the spray would likely need to be applied repeatedly, and the process would require a lot of manpower. Gared wanted Best Bolt to accept the return of the unused pulleys and pay for the replacement of the pulleys that had been already been used, but Best Bolt refused. Concerned that the basketball goal systems incorporating the Best Bolt pulley posed a safety hazard, Gared decided to replace the pulleys with a more expensive pulley manufactured by Block Division ("Block"). Gared refused to pay for the second order of Best Bolt pulleys and also refused delivery of an order of clevis pins.

On September 10, 2009, Gared filed a complaint against Best Bolt stating five claims: breach of contract, breach of the implied warranty of merchantability, breach of the implied warranty of fitness for a particular purpose, breach of express warranty, and fraud. On November 4, 2009, Best Bolt filed an answer and a counterclaim seeking payment for the second order of pulleys and the clevis pins.

A bench trial was held on June 5 through 7, 2012. It was undisputed that Gared did not specifically request that the pulley have a lubricated bushing. However, Gared

6

attempted to show that a lubricated bushing was a standard or essential component of a pulley, and therefore a buyer would not typically need to make a specific request for a lubricated bushing. Connerly testified that he considered pulleys to be an "off-the-shelf" item that could be purchased from a catalog without needing to provide a drawing. He testified that a buyer would not have to specify that it have a lubricated bushing or bearing because "[t]hat's standard in the industry." *Id*. at 189. Connerly stated that the pulleys that Gared has purchased from suppliers other than Best Bolt have all had lubricated bushings and did not have problems with seizing up. Connerly testified that a pulley without a lubricated bushing could work only "[f]or a short period of time," but not for the "expected life of the … pulley." *Id*. at 190. He stated that the Best Bolt pulleys started failing less than a year after the basketball goal systems were sold, and he would expect a pulley to last more than a year. Connerly testified that he had not opted to perform a cycle test on the pulleys before approving them for purchase because "the pulleys that … are normally manufactured … it's a requirement of that pulley to be able to rotate. So when you purchase a pulley you expect it to be able to rotate and it was really no reason to do a cycle test at that point in time." *Id*. at 188. After the problem arose with the Best Bolt pulleys, Connerly made a detailed drawing of a pulley "so that if we chose to go to … another supplier who was not a normal manufacturer of pulley[s] they would understand the requirements of manufacturing a pulley." *Id*. at 200. However, when Gared started purchasing pulleys from Block, it did not provide the drawing to Block because Block had its own drawing.

Turner likewise testified that the pulleys that Gared had purchased from other manufacturers all had lubricated bushings. She said that at the time that she started ordering from Best Bolt, Gared did not have a specification sheet for the #5 pulley because "it was a standard item. There was nothing custom about it…." *Id*. at 52. She did not think that it was necessary to specify that the pulleys needed to have a lubricated bushing because they were an off-the-shelf item and always have a lubricated bushing.

Kevin Needler, the operations manager of Gared, also characterized pulleys as an off-the-shelf part. Needler also testified that the pulleys that Gared had purchased from other manufacturers all had lubricated bushings. He stated that Gared had not had to ask Inventory Sales or Block to provide a lubricated bushing.

Gared also presented testimony from Bobby Day, the president of Block. Day has a B.S. degree in engineering and has designed a pulley. Day testified that he did not ask Gared to supply a drawing and that Block's customers typically rely on its catalog. He characterized the pulley that Block sells to Gared as an off-the-shelf product. While he agreed that it would be good practice to give a manufacturer a set of requirements, he did not think that a pulley should be made without a lubricated bushing regardless of what the requirements were. Day opined that the Best Bolt pulley was "doomed to failure" because the friction between the metal parts would eventually "cause the effect known as galling where the metal will grab to the metal and finally it will just completely seize." *Id*. at 273-74. Day testified that he is not aware of any manufacturer that makes a pulley without a lubricated bushing and that it would not be good engineering or manufacturing practice to do so.

Alan Jones, the president of Dakota, testified that he knew that the pulleys would bear a dynamic (moving) load. He acknowledged that the pulleys had failed due to galling between the wheel and axle, and the problem could have been prevented by a lubricated bushing. Jones is not an engineer, and he stated that he would not disagree with Day's testimony that a lubricated bushing is an essential component of a pulley. However, he also testified that they did not receive drawings or specifications, that "every other product we sell is made to a specification," and that it "is very uncommon to typical engineering business – to just have an unknown sample." *Id*. at 338.

Dustin Hostetler, the quality manager of Best Bolt, testified that he knew that "if you had metal on metal it could fail," and that the purpose of a bushing would be to prevent that problem. *Id*. at 361. He was not aware that the pulleys lacked a bushing until Gared started having problems with the pulleys. However, he also testified that Best Bolt normally had prints and standards for the items that it sells.

Best Bolt presented expert testimony from Peter Hylton, an associate professor in the School of Engineering and Technology at Indiana University Purdue University Indianapolis. Hylton testified that he had never designed a pulley, but if he were asked to do so, he would want to know the specifications, such as dimensions and material properties. In the absence of specifications, he would want to know the "requirements," which he defined as "the set of operating characteristics under which the component or the assembly or subassembly whatever you're discussing will be operating that defines what it must be able to do – withstand, that sort of thing." *Id*. at 451-52.

9

Hylton agreed that the Best Bolt pulleys had failed due to galling between the wheel and axle. He also agreed that it is not possible to tell that the pulleys are not lubricated without taking them apart. When asked if dynamic testing of the pulleys would have been appropriate, he said, "I would've thought it would've been mandatory." *Id*. at 476.

Hylton testified that he had done some research on the internet and found one supplier that sold pulleys that could be ordered with or without bushings. He also stated that he has his students conduct a laboratory experiment involving pulleys, and those pulleys do not have bushings. He testified that "under certain load – static load or … very low dynamic loads a non[-]bushed pulley could work just as well as a bushed pulley." *Id*. at 509.

Gared voluntarily dismissed its fraud claim during the bench trial. On September 21, 2012, the trial court entered a judgment for Best Bolt on Gared's remaining claims and on Best Bolt's counterclaim. The court's order included findings of fact and conclusions thereon. As to Gared's breach of contract claim, the court's order states:

> The Court finds that the facts do not establish that there was an oral contract for the sale of pulleys which matched the samples provided by Turner to Sparks…. Turner and Sparks nor any other representative of either company agreed that they would provide pulleys identical to the samples furnished by Turner. In fact, Best Bolt furnished samples of what it "could do." Gared agreed that [it] would complete [its] own inspection and testing on the samples provided by Best Bolt, as required by Gared policy.… [I]t was established that Best Bolt would provide samples of what it could supply at a cost that Gared would pay, and Gared would do its own inspection and testing to determine if the Best Bolt pulleys would work for Gared in its basketball systems.

Appellant's App. at 17-18.

10

As to Gared's claim for breach of the warranty of merchantability, the court's order states: "The evidence demonstrated that this was the first and last sale of pulleys by Best Bolt. In fact Best Bolt was merely the distributor and Gared was aware that Best Bolt was trying to find a company to manufacture the pulleys at a price acceptable to Gared." *Id*. at 20.

As to Gared's claim for breach of the warranty of fitness for a particular purpose, the court's order noted that Gared was required to prove three things: (1) that Best Bolt had reason to know of Gared's particular purpose; (2) that Best Bolt had reason to believe that Gared was relying on Best Bolt's skill and judgment; and (3) that Gared in fact had relied on Best Bolt's skill and judgment. The court found that Best Bolt knew that the pulleys would be used in basketball goal systems. However, the court found that the evidence was unclear as to the second element and that Gared had not established the third element. The trial court also rejected Gared's claim for breach of express warranty. Having rejected all of Gared's claims, the trial court found that Gared was not justified in rejecting the second order of pulleys and the order of clevis pins and therefore entered judgment for Best Bolt on Best Bolt's counterclaim. Gared now appeals.

**Discussion and Decision**

The trial court issued findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A). Our standard of review is well-settled:

> First, we must determine whether the evidence supports the trial court's findings of fact. Second, we must determine whether those findings of fact support the trial court's conclusions of law. We will set aside the findings only if they are clearly erroneous. Findings are clearly erroneous only when the record contains no facts to support them either directly or by

11

inference. A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts.

In applying this standard, we neither reweigh the evidence nor judge the credibility of the witnesses. Rather, we consider the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. To make a determination that a finding or conclusion is clearly erroneous, our review of the evidence must leave us with the firm conviction that a mistake has been made.

*Hartley v. Hartley,* 862 N.E.2d 274, 281 (Ind. Ct. App. 2007) (quoting *Gregg v. Cooper,* 812 N.E.2d 210, 214-15 (Ind. Ct. App. 2004), *trans. denied*).

Gared argues that the trial court's findings regarding Gared's claims for breach of contract, breach of the implied warranty of fitness for a particular purpose, and breach of the implied warranty of merchantability are erroneous. Gared also argues that it had a proper basis for rejecting the second order of #5 pulleys and that the court therefore erred in its ruling on Best Bolt's counterclaim insofar as Gared was ordered to pay for the #5 pulleys.[1]

## I. Breach of Contract

"The elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." *Murat Temple Ass'n v. Live Nation Worldwide, Inc.*, 953 N.E.2d 1125, 1128-29 (Ind. Ct. App. 2011), *trans. denied*. Gared was required to prove these elements by a preponderance of the evidence. *Rollins Burdick Hunter of Utah, Inc. v. Bd. of Trs. of Ball State Univ.*, 665 N.E.2d 914, 922 (Ind. Ct. App. 1996).

---

[1] Gared does not challenge the trial court's ruling that it must pay Best Bolt for the #3 pulleys and clevis pins.

12

Gared does not dispute that it did not provide detailed specifications to Best Bolt and did not specifically request a lubricated bushing. Gared argues, however, that the parties' agreement required Best Bolt to match the samples that Gared provided.

Sparks testified that Turner approached him about providing pulleys:

A. Well, what happened whenever she asked me about pulleys she had a problem with pulleys she was using where the wire rope had slipped out of the pulley and lodged between the side and wheel. She said, I got a problem – she said I don't need this. So she said, can you take of this – can you find me a source. And I said, yes I think we can find you a source.

Q. And she gave you [a] sample, didn't she?

A. Yes she did.

Q. And she told you that's what she needed, didn't she?

A. No, she didn't tell me anything like that.

Q. Okay what did she tell when she gave me the sample?

A. She asked me to see what I could do.

Tr. at 118.

While Gared employees denied that there was a problem with the Inventory Sales pulleys that they had been using at the time, the trial court rejected this testimony and found that Gared "wanted to locate a new pulley vendor due to price and quality problems with the current vendor." Appellant's App. at 10. This finding is supported by Sparks's testimony.

Gared faults the trial court for finding that the agreement merely required Best Bolt to produce a sample within Gared's price range and that Gared would do its own testing to determine whether the pulleys would be suitable for use in its basketball goal

13

systems. Gared notes that the testing that was performed was to determine the strength of the pulley and was not designed to reveal whether the pulley was properly lubricated. Even if we were to conclude that the trial court improperly relied on the testing that Gared had performed on the pulleys, that still does not alter the trial court's valid finding that Gared was having problems with the Inventory Sales pulleys. From that fact, it is reasonable to conclude that Gared did not want or expect Best Bolt to replicate the Inventory Sales pulley. Gared's argument is a request to reweigh the evidence, which we will not do.

## II. Implied Warranty of Fitness for a Particular Purpose

Indiana's version of the Uniform Commercial Code provides:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is, unless excluded or modified under IC 26-1-2-316, an implied warranty that the goods shall be fit for such purpose.

Ind. Code § 26-1-2-315. The implied warranty of merchantability is imposed by operation of law for the protection of the buyer, and it must be liberally construed in favor of the buyer. *Woodruff v. Clark Cnty. Farm Bureau Coop. Ass'n*, 153 Ind. App. 31, 43, 286 N.E.2d 188, 194-95 (1972).

In an action for breach of the warranty of fitness for a particular purpose, the buyer must show: "(1) that seller must have had reason to know buyer's particular purpose, (2) that seller must have had reason to believe buyer was relying on seller's skill and judgment, and (3) that buyer in fact had relied on seller's skill and judgment." *Paper*

14

*Mfrs. Co. v. Rescuers, Inc.*, 60 F. Supp. 2d 869, 881 (N.D. Ind. 1999).[2]  The trial court found that Gared proved the first element, that the evidence was unclear as to the second element, and that Gared had not proven the third element by a preponderance of the evidence.

On cross-examination, Connerly was questioned about whether Gared relied on Best Bolt's judgment:

> Q.  Knowing that your standard operating procedure was to check specifications and[/]or a drawing and[/]or a narrative and based upon your testimony that you did that in this case and that you tested … the pulleys the way you wanted and that you inspected them the way that you wanted to, isn't it a fact that you were not relying on Best Bolt's judgment as to what Gared needed for this Number Five (#5) pulley?
>
> A.  That would be correct.
>
> ….
>
> Q.  Would you agree that Best Bolt never advised Gared that the Best Bolt pulley would do whatever it was that Gared required?
>
> A.  Not to my knowledge.
>
> Q.  In fact Gared made its own independent analysis that the pulleys would meet its requirements, isn't that right?
>
> A.  That's correct.

Tr. at 240, 243.

On redirect, Connerly testified as follows:

---

[2]  Naturally, we are not bound by a federal district court's interpretation of Indiana law.  However, there are a limited number of cases interpreting Indiana Code Section 26-1-2-315.  Both parties cite *Paper Manufacturers* for its list of elements, and we agree that it appears to be an accurate summary of the elements that must be proved by the buyer.  *See* Ind. Code § 26-1-2-315, cmt. 1 ("Under this section the buyer need not bring home to the seller actual knowledge of the particular purpose for which the goods are intended or of his reliance on the seller's skill and judgment, if the circumstances are such that the seller has reason to realize the purpose intended or that the reliance exists.  The buyer, of course, must actually be relying on the seller.").

Q. [D]id you ever have any expectation that the Best Bolt pulleys would not have a lubricated bearing?

A. No.

Q. Or a bushing?

A. No.

Q. [D]id you rely on them to provide that?

A. Yes.

*Id*. at 254-55.

Connerly initially testified that Gared did not rely on Best Bolt's judgment, and while he later stated that he relied on Best Bolt to provide a lubricated bushing, it is clear from his testimony as a whole that he knew that the pulley needed to have a lubricated bushing and assumed that Best Bolt would know that, too. Gared again notes that the testing that was performed on the pulleys was not designed to show whether the pulley was properly lubricated. However, the evidence reflects that Gared determined what testing would be performed and did not rely on Best Bolt to perform any testing. The drawing that Connerly later produced demonstrates that Gared knew what it needed in a pulley and was capable of specifying its needs; Gared simply failed to do so. *See Adsit Co. v. Gustin*, 874 N.E.2d 1018, 1024-25 (Ind. Ct. App. 2007) (seller of vehicle seat covers did not breach warranty of merchantability by supplying seat covers that did not match interior of vehicle where buyer did not provide vehicle's VIN number or other information that would enable seller to determine the exact color needed). The evidence

favorable to the judgment supports the trial court's conclusion that Gared failed to establish that it relied on Best Bolt's judgment to select a suitable pulley.

### III. Implied Warranty of Merchantability

The trial court ruled that the implied warranty of merchantability did not apply because Best Bolt is not a merchant as that term is defined by Indiana's version of the Uniform Commercial Code. Indiana Code Section 26-1-2-314(1) provides: "Unless excluded or modified (IC 26-1-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." The comments to this section state, "A person making an isolated sale of goods is not a 'merchant' within the meaning of the full scope of this section and, thus, no warranty of merchantability would apply." Ind. Code § 26-1-2-314, cmt. 3. Indiana Code Section 26-1-2-104 defines a "merchant" as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction." The comments to this section state that, in the context of the implied warranty of merchantability, the term "merchant" is restricted "to a much smaller group than everyone who is engaged in business and requires a professional status as to particular kinds of goods." Ind. Code § 26-1-2-104, cmt. 2. At the same time, our cases hold that the implied warranty of merchantability "is imposed by operation of law for the protection of the buyer and must be liberally construed in favor of the buyer." *Frantz v. Cantrell*, 711 N.E.2d 856, 859 (Ind. Ct. App. 1999).

17

Regarding Gared's claim for breach of the warranty of merchantability, the court's order states: "The evidence demonstrated that this was the first and last sale of pulleys by Best Bolt. In fact Best Bolt was merely the distributor and Gared was aware that Best Bolt was trying to find a company to manufacture the pulleys at a price acceptable to Gared." Appellant's App. at 20. The term "merchant" is not limited to manufacturers, and Best Bolt does not cite any authority that supports the proposition that a distributor cannot be a merchant. Furthermore, the court's order is incorrect insofar as it states that Best Bolt made only one sale of pulleys. Best Bolt made two sales to Gared, and we also note that Best Bolt's vice president testified that Best Bolt would be willing to continue selling pulleys if it had a buyer.

Gared argues that if the trial court's "interpretation of the definition of 'merchant' is accepted then a seller such as Defendant which sells a wide variety of industrial products would get a free pass on its first sale of any item that it sold." Appellant's Br. at 13. Although the number or frequency of sales surely is relevant to the question of whether a seller is a merchant, we are inclined to agree that a small number of sales is not necessarily conclusive proof that the seller is not a merchant; rather, it could be indicative that the seller simply has a relatively new product or a limited market for a particular product.

Gared argues that this case is similar to *Frantz.* In that case, a homeowner sued Joseph Frantz and Frantz Lumber Company over defective shingles that were installed on his roof. The opinion treats Frantz and the lumber company as a single entity, although the opinion is somewhat vague as to their relationship and the lumber company's role in

18

the work that was performed on the roof.  However, the ultimate holding appears to be that the lumber company was found to be a merchant of shingles because it represented that it sold "all kinds of building material" and appeared knowledgeable about roofing materials.  *Frantz*, 711 N.E.2d at 859.  Similarly, Best Bolt sold a variety of hardware products, and pulleys are in the same general line of business.  On the other hand, *Frantz* does not shed much light on the issue of whether a seller who has made only a few sales of a product may be considered a merchant.

*Frantz* is one of only a few Indiana cases to discuss the meaning of the term merchant; therefore, we find it helpful to look to cases from other jurisdictions that have addressed the issue.  One commentator states:

> A single, isolated transaction is not enough to establish that a merchant deals in goods of that kind, but one can be found to be a merchant for this purpose if he customarily sells a general line of goods related to the item in question, even though that specific item is being sold for the first time.

HAWKLAND'S UNIFORM COMMERCIAL CODE SERIES § 2-314:2 (West 2012) (footnotes omitted).  *Wood Products v. CMI Corp.*, 651 F. Supp. 641 (D. Md. 1986), is cited in support.

*Wood Products* concerned a furnace that was originally designed by James Angelo to convert sawdust and other wood waste products into charcoal.  CMI Corporation obtained the rights to manufacture the Angelo furnace and sold one to Wood Products, a company primarily engaged in milling and selling lumber.  CMI altered the design of the furnace to incorporate a larger drum. Wood Products began experiencing problems with the furnace almost immediately, most of which stemmed from the fact that the drum was

19

too large and too thin. Wood Products sued CMI on several theories, including breach of the warranty of merchantability. CMI argued that it was not a merchant with respect to goods of the kind due to "the experimental nature of the furnace." *Id*. at 650. The court disagreed, noting that CMI "was then manufacturing (for the use of one of its affiliates) a similar furnace and it has manufactured another since." *Id*. at 650-51. *See also Geo. Byers Sons, Inc. v. E. Europe Import Export, Inc.*, 488 F. Supp. 574, 580 (D. Md. 1980) (company that was trying to establish an American market for East European vehicles was held to be a merchant of East German motorcycles even though its only other sale at the time was a single Romanian jeep).

Best Bolt argues that this case is similar to *Fred J. Moore, Inc. v. Schinmann*, 700 P.2d 754 (Wash. App. 1985). In that case, the Moore family was in the business of growing mint for the production of mint oil. The Moores were approached by the Schinmanns, who wished to buy spearmint roots. The Moores had never previously sold mint roots, but ultimately agreed to sell roots to the Schinmanns. When the mint roots turned out to be a mixture of spearmint and peppermint, the Schinmanns sued the Moores on several theories, including the warranty of merchantability. The court held that the Moores were not merchants with respect to mint roots because "this was the first and only sale of roots by the Moores." *Id*. at 757. *Moore* involved a single sale, and there was no evidence to suggest that the Moores were interested in continuing to sell mint roots. The case at bar is more similar to *Wood Products* and *Geo. Byers*, where the sellers had made a few sales and there was evidence to suggest that the sellers were attempting to develop a new market.

20

We conclude that the trial court erred by focusing on the fact that Best Bolt was a distributor rather than a manufacturer because that fact is not relevant to the analysis. We also conclude that the trial court erred by characterizing Best Bolt's experience with pulleys as a single sale where the undisputed evidence reflects that Best Bolt made two sales and was willing to continue selling pulleys if it had a buyer. *See McHugh v. Carlton*, 369 F. Supp. 1271, 1277 (D.S.C. 1974) (service station that would procure and sell recapped tires upon request of customer was a merchant of recapped tires even though service station did not regularly stock and sell recapped tires). Based on the authorities that we have examined, we conclude that Best Bolt is a merchant with respect to pulleys.

We turn then to whether Best Bolt breached the implied warranty of merchantability. Indiana Code Section 26-1-2-314(2) provides:

Goods to be merchantable must at least be such as:

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair, average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

21

(f) conform to the promises or affirmations of fact made on the container or label if any.

The undisputed evidence establishes that the ordinary purpose of a pulley is to bear a dynamic load. Several of Gared's witnesses testified that a lubricated bushing was an essential part of a pulley, that lubricated bushings were standard in the industry, that it was unreasonable to make pulleys without lubricated bushings, and that a pulley without a lubricated bushing would inevitably have a short useful life. On the other hand, Hylton testified that he was aware of pulleys made without lubricated bushings and opined that "under certain load – static load or … very low dynamic loads a non[-]bushed pulley could work just as well as a bushed pulley." Tr. at 509. Because the evidence is in conflict and the trial court did not reach the issue, we remand for the trial court to determine whether Best Bolt breached the warranty of merchantability. Depending on the trial court's resolution of this issue, it may also be necessary to reconsider the portion of Best Bolt's counterclaim dealing with #5 pulleys.

**Conclusion**

We conclude that the trial court's judgment on Gared's claims of breach of contract and breach of the implied warranty of fitness for a particular purpose is supported by the evidence, and we affirm as to those issues. However, we conclude that the trial court erred in ruling that Best Bolt was not a merchant. We therefore remand for the trial court to determine whether Best Bolt breached the implied warranty of merchantability, and if so, whether that alters the result of Best Bolt's counterclaim.

Affirmed in part and remanded.

FRIEDLANDER, J., concurs.

ROBB, C.J., concurs with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

GARED HOLDINGS, LLC,          )
          )
   Appellant-Plaintiff/Counterdefendant,   )
          )
      vs.          )     No. 49A02-1210-PL-811
          )
BEST BOLT PRODUCTS, INC.,          )
          )
   Appellee-Defendant/Counterclaimant.   )

ROBB, Chief Judge, concurring with separate opinion

I concur in the majority's result with respect to Gared's breach of contract and implied warranty of merchantability claims. I respectfully dissent, however, from the resolution of the implied warranty of fitness for a particular purpose claim.

The implied warranty of fitness for a particular purpose occurs where the seller has reason at the time of contracting to know of any particular purpose for which the goods are being purchased and the buyer is relying on the seller's skill or judgment in choosing suitable goods for that purpose. See Irmscher Suppliers, Inc. v. Schuler, 909 N.E.2d 1040, 1048n.4 (Ind. Ct. App. 2009). The trial court found that Gared had proved Best Bolt knew of the particular purpose for which the goods would be used – to raise and lower basketball backboards. I believe when Gared asked Best Bolt to procure pulleys and Best Bolt agreed to do so, Gared was relying on Best Bolt to offer a pulley that would suit this purpose and further, that Gared demonstrated that reliance when it did

24

<u>not</u> test the pulleys for lubrication because, as the majority notes in the discussion of the implied warranty of merchantability, there was testimony indicating a lubricated bushing is an essential part of a pulley and is standard in the industry. Non-lubricated bushings could bear a static load or low dynamic load, but not the load Best Bolt knew these pulleys would be bearing. Gared gave Best Bolt a sample pulley, and although Gared did not want an exact replica of that pulley because they were having quality issues with the cable separating and jamming between parts of the pulley, there were no quality issues with the lubricated bushing and Best Bolt, offering to procure a suitable replacement, held itself out to have the ability to judge what would be suitable.

I would reverse the trial court's judgment in favor of Best Bolt on the implied warranty of fitness for a particular purpose claim.