**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED
Nov 19 2014, 10:13 am
CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JEFFREY O. MEUNIER**
Carmel, Indiana

ATTORNEY FOR APPELLEE:

**S. GREGORY ZUBEK**
Whitham Hebenstreit & Zubek LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| GARED HOLDINGS, LLC, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 49A04-1404-PL-181 |
| | ) | |
| BEST BOLT PRODUCTS, INC., | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Heather A. Welch, Judge
Cause No. 49D12-0909-PL-41784

**November 19, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Gared Holdings, LLC ("Gared"), appeals from the trial court's order of March 28, 2014, finding that Best Bolt, Inc. ("Best Bolt") breached an implied warranty of merchantability with respect to certain pulleys and awarding damages based upon the pulleys' fair market value. Gared raises one issue, which we restate as whether the court erred in finding Gared was not entitled to consequential damages. Best Bolt raises an issue on cross-appeal, which we restate as whether the court erred in finding that Best Bolt breached its warranty of merchantability. Best Bolt also argues this appeal should be dismissed. We affirm.

## FACTS AND PROCEDURAL HISTORY

The facts as stated in our previous opinion in this litigation follow:

> Best Bolt primarily sells fasteners, such as "bolts, nuts and screws and miscellaneous hardware items." Tr. at 115. Best Bolt is a distributor; it does not manufacture the products that it sells. Sometime in 2006, Curtis Sparks, a salesman for Best Bolt, noticed that Gared had playground equipment outside its facility and thought that Gared could be a potential customer. Sparks stopped in and introduced himself. He was directed to Lori Turner, a purchasing manager who is responsible for ordering parts that Gared uses in the products that they manufacture. Sparks began stopping in every four weeks in hopes of establishing a business relationship with Gared. Gared eventually placed orders for cable clamps, clevis pins, and D rings.
>
> At issue in this case are two orders that Gared placed for pulleys. Gared uses pulleys in the basketball goal systems that it manufactures. The basketball goals are designed to hang from the ceiling and can be raised and lowered. The facts favorable to the judgment reflect that, during one of Sparks's regular sales calls in 2006, Turner asked him if Best Bolt could supply pulleys. Turner indicated that their current supplier, Inventory Sales, was going to raise the price, and she was hoping to find a less expensive pulley. Turner also indicated that there was a problem with cables slipping off the wheel and becoming lodged between the wheel and the side plate. Turner provided samples [sic] pulleys in two sizes, # 3 and # 5. Sparks told Turner, "I'll see what I can do." Id. at 129. Sparks did not

tell Turner that neither he personally nor Best Bolt generally had ever sold pulleys before.

Sparks requested a drawing, but Turner indicated that they did not have one. Gared did not provide detailed specifications for the pulleys, but did indicate that the # 5 pulleys needed to be rated at 1550 pounds, withstand a standard pull test of 8000 pounds, and withstand a side pull test of 5000 pounds. At some point during the design process, Gared also requested that the pulleys be fastened together with nylocks rather than rivets.

Best Bolt decided to source the pulleys through Dakota Engineering, which would manufacture the pulleys in China. The sample pulleys from Gared were sent to Dakota's engineer in China, who sent back a sample. Joe Connerly, the engineering manager for Gared, examined the samples, measured the diameter, and looked for a proper gap between the wheel and side plate. He did not take the samples apart because they "appeared to be correct." Id. at 191. Although he could not tell for sure without taking the pulley apart, he believed that the pulley contained a lubricated bushing because there was a small gap on each side of the wheel between the wheel and the side plate. However, the sample pulleys did not actually have a bushing.

Gared then sent the samples to St. Louis Labs, which performed the standard pull and side pull tests. The standard pull test involves pulling down on the pulley to see how much weight it takes to destroy the pulley. The side pull test is designed to determine how much force it takes to pull the pulley apart from the sides. The sample pulleys exceeded the minimum requirements that Gared had set for each test.

On June 27, 2007, after receiving the test results, Turner placed an order with Best Bolt for 4995 # 5 pulleys. On April 14, 2008, Turner placed an order for 2000 # 3 pulleys and an additional 5000 # 5 pulleys. The purchase order requested that Best Bolt send samples of each for testing, although it is unclear whether Best Bolt sent the samples and, if so, whether Gared had any testing done.

In the fall of 2008, one of Gared's customers reported that a basketball goal had fallen part way to the floor. Connerly examined the goal system and determined that the pulley had stopped turning. Because the pulley was not moving with the cable, the cable eventually became frayed and snapped. Connerly took the pulley apart and realized for the first time that the pulley did not have a bushing and was not lubricated in any way. Without any lubrication, the wheel and axle had become "frozen"

3

together.  Id. at 194.  Connerly conducted a cycling test on two Best Bolt pulleys, which involves repeatedly lifting and lowering a load.  The pulleys each seized up after twenty-one cycles.

Gared contacted Best Bolt about the problem, and Best Bolt proposed applying a spray lubricant to the pulleys.  Connerly felt that this solution was inadequate because there was no guarantee that the spray could be accurately applied to the axle, the spray would likely need to be applied repeatedly, and the process would require a lot of manpower.  Gared wanted Best Bolt to accept the return of the unused pulleys and pay for the replacement of the pulleys that had [] already been used, but Best Bolt refused.  Concerned that the basketball goal systems incorporating the Best Bolt pulley posed a safety hazard, Gared decided to replace the pulleys with a more expensive pulley manufactured by Block Division ("Block").  Gared refused to pay for the second order of Best Bolt pulleys and also refused delivery of an order of clevis pins.

On September 10, 2009, Gared filed a complaint against Best Bolt stating five claims: breach of contract, breach of the implied warranty of merchantability, breach of the implied warranty of fitness for a particular purpose, breach of express warranty, and fraud.  On November 4, 2009, Best Bolt filed an answer and a counterclaim seeking payment for the second order of pulleys and the clevis pins.

A bench trial was held on June 5 through 7, 2012.  It was undisputed that Gared did not specifically request that the pulley have a lubricated bushing.  However, Gared attempted to show that a lubricated bushing was a standard or essential component of a pulley, and therefore a buyer would not typically need to make a specific request for a lubricated bushing.  Connerly testified that he considered pulleys to be an "off-the-shelf" item that could be purchased from a catalog without needing to provide a drawing.  He testified that a buyer would not have to specify that it have a lubricated bushing or bearing because "[t]hat's standard in the industry." Id. at 189.  Connerly stated that the pulleys that Gared has purchased from suppliers other than Best Bolt have all had lubricated bushings and did not have problems with seizing up.  Connerly testified that a pulley without a lubricated bushing could work only "[f]or a short period of time," but not for the "expected life of the . . . pulley."  Id. at 190.  He stated that the Best Bolt pulleys started failing less than a year after the basketball goal systems were sold, and he would expect a pulley to last more than a year.  Connerly testified that he had not opted to perform a cycle test on the pulleys before approving them for purchase because "the pulleys that . . . are normally manufactured . . . it's a requirement of that pulley to be able to rotate.  So when you purchase a pulley you expect it to be able to rotate and it was

really no reason to do a cycle test at that point in time." Id. at 188. After the problem arose with the Best Bolt pulleys, Connerly made a detailed drawing of a pulley "so that if we chose to go to . . . another supplier who was not a normal manufacturer of pulley[s] they would understand the requirements of manufacturing a pulley." Id. at 200. However, when Gared started purchasing pulleys from Block, it did not provide the drawing to Block because Block had its own drawing.

Turner likewise testified that the pulleys that Gared had purchased from other manufacturers all had lubricated bushings. She said that at the time that she started ordering from Best Bolt, Gared did not have a specification sheet for the # 5 pulley because "it was a standard item. There was nothing custom about it. . . ." Id. at 52. She did not think that it was necessary to specify that the pulleys needed to have a lubricated bushing because they were an off-the-shelf item and always have a lubricated bushing.

Kevin Needier [sic],[1] the operations manager of Gared, also characterized pulleys as an off-the-shelf part. Needier [sic] also testified that the pulleys that Gared had purchased from other manufacturers all had lubricated bushings. He stated that Gared had not had to ask Inventory Sales or Block to provide a lubricated bushing.

Gared also presented testimony from Bobby Day, the president of Block. Day has a B.S. degree in engineering and has designed a pulley. Day testified that he did not ask Gared to supply a drawing and that Block's customers typically rely on its catalog. He characterized the pulley that Block sells to Gared as an off-the-shelf product. While he agreed that it would be good practice to give a manufacturer a set of requirements, he did not think that a pulley should be made without a lubricated bushing regardless of what the requirements were. Day opined that the Best Bolt pulley was "doomed to failure" because the friction between the metal parts would eventually "cause the effect known as galling where the metal will grab to the metal and finally it will just completely seize." Id. at 273-74. Day testified that he is not aware of any manufacturer that makes a pulley without a lubricated bushing and that it would not be good engineering or manufacturing practice to do so.

Alan Jones, the president of Dakota, testified that he knew that the pulleys would bear a dynamic (moving) load. He acknowledged that the pulleys had failed due to galling between the wheel and axle, and the problem could have been prevented by a lubricated bushing. Jones is not an engineer, and he stated that he would not disagree with Day's testimony

---

[1] The transcript spells Kevin Needler's name as Needler.

that a lubricated bushing is an essential component of a pulley. However, he also testified that they did not receive drawings or specifications, that "every other product we sell is made to a specification," and that it "is very uncommon to typical engineering business—to just have an unknown sample." Id. at 338.

Dustin Hostetler, the quality manager of Best Bolt, testified that he knew that "if you had metal on metal it could fail," and that the purpose of a bushing would be to prevent that problem. Id. at 361. He was not aware that the pulleys lacked a bushing until Gared started having problems with the pulleys. However, he also testified that Best Bolt normally had prints and standards for the items that it sells.

Best Bolt presented expert testimony from Peter Hylton, an associate professor in the School of Engineering and Technology at Indiana University Purdue University Indianapolis. Hylton testified that he had never designed a pulley, but if he were asked to do so, he would want to know the specifications, such as dimensions and material properties. In the absence of specifications, he would want to know the "requirements," which he defined as "the set of operating characteristics under which the component or the assembly or subassembly whatever you're discussing will be operating that defines what it must be able to do—withstand, that sort of thing." Id. at 451-52.

Hylton agreed that the Best Bolt pulleys had failed due to galling between the wheel and axle. He also agreed that it is not possible to tell that the pulleys are not lubricated without taking them apart. When asked if dynamic testing of the pulleys would have been appropriate, he said, "I would've thought it would've been mandatory." Id. at 476.

Hylton testified that he had done some research on the internet and found one supplier that sold pulleys that could be ordered with or without bushings. He also stated that he has his students conduct a laboratory experiment involving pulleys, and those pulleys do not have bushings. He testified that "under certain load—static load or . . . very low dynamic loads a non[-]bushed pulley could work just as well as a bushed pulley." Id. at 509.

Gared voluntarily dismissed its fraud claim during the bench trial. On September 21, 2012, the trial court entered a judgment for Best Bolt on Gared's remaining claims and on Best Bolt's counterclaim. The court's order included findings of fact and conclusions thereon. As to Gared's breach of contract claim, the court's order states:

6

> The Court finds that the facts do not establish that there was an oral contract for the sale of pulleys which matched the samples provided by Turner to Sparks. . . . Turner and Sparks nor any other representative of either company agreed that they would provide pulleys identical to the samples furnished by Turner. In fact, Best Bolt furnished samples of what it "could do." Gared agreed that [it] would complete [its] own inspection and testing on the samples provided by Best Bolt, as required by Gared policy. . . . [I]t was established that Best Bolt would provide samples of what it could supply at a cost that Gared would pay, and Gared would do its own inspection and testing to determine if the Best Bolt pulleys would work for Gared in its basketball systems.

Appellant's App. at 17-18.

As to Gared's claim for breach of the warranty of merchantability, the court's order states: "The evidence demonstrated that this was the first and last sale of pulleys by Best Bolt. In fact Best Bolt was merely the distributor and Gared was aware that Best Bolt was trying to find a company to manufacture the pulleys at a price acceptable to Gared." Id. at 20.

As to Gared's claim for breach of the warranty of fitness for a particular purpose, the court's order noted that Gared was required to prove three things: (1) that Best Bolt had reason to know of Gared's particular purpose; (2) that Best Bolt had reason to believe that Gared was relying on Best Bolt's skill and judgment; and (3) that Gared in fact had relied on Best Bolt's skill and judgment. The court found that Best Bolt knew that the pulleys would be used in basketball goal systems. However, the court found that the evidence was unclear as to the second element and that Gared had not established the third element. The trial court also rejected Gared's claim for breach of express warranty. Having rejected all of Gared's claims, the trial court found that Gared was not justified in rejecting the second order of pulleys and the order of clevis pins and therefore entered judgment for Best Bolt on Best Bolt's counterclaim.

Gared Holdings, LLC v. Best Bolt Prods., Inc., 991 N.E.2d 1005, 1007-1011 (Ind. Ct. App. 2013) ("Gared Holdings I"), reh'g denied, trans. denied.

Gared appealed and argued that the trial court's findings regarding its claims for breach of contract, breach of the implied warranty of fitness for a particular purpose, and

7

breach of the implied warranty of merchantability were erroneous and that it had a proper basis for rejecting the second order of #5 pulleys, and the court therefore erred in its ruling on Best Bolt's counterclaim insofar as Gared was ordered to pay for the #5 pulleys. Id. at 1012. Gared did not challenge the court's ruling that it must pay Best Bolt for the #3 pulleys and clevis pins. Id.

This court affirmed the findings of the trial court with respect to Gared's claims for breach of contract and implied warranty of fitness for a particular purpose. See id. at 1012-1014. With respect to the claim of implied warranty of merchantability, we found that the trial court erred by focusing on the fact that Best Bolt was a distributor rather than a manufacturer and concluded that Best Bolt is a merchant with respect to pulleys. Id. at 1016. We then turned to whether Best Bolt breached the implied warranty of merchantability and noted the provisions of Ind. Code § 26-1-2-314(2).[2] We observed that the undisputed evidence establishes that the ordinary purpose of a pulley is to bear a

---

[2] Ind. Code § 26-1-2-314(2) provides:

Goods to be merchantable must at least be such as:

    (a)    pass without objection in the trade under the contract description; and

    (b)    in the case of fungible goods, are of fair, average quality within the description; and

    (c)    are fit for the ordinary purposes for which such goods are used; and

    (d)    run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved; and

    (e)    are adequately contained, packaged, and labeled as the agreement may require; and

    (f)    conform to the promises or affirmations of fact made on the container or label if any.

dynamic load, that several of Gared's witnesses testified that a lubricated bushing was an essential part of a pulley, that lubricated bushings were standard in the industry, that it was unreasonable to make pulleys without lubricated bushings, and that a pulley without a lubricated bushing would inevitably have a short useful life. Id. We also observed that Hylton testified that he was aware of pulleys made without lubricated bushings and opined that "under certain load—static load or . . . very low dynamic loads a non[-]bushed pulley could work just as well as a bushed pulley." Id. (citing Transcript at 509). We concluded that, "[b]ecause the evidence is in conflict and the trial court did not reach the issue, we remand for the trial court to determine whether Best Bolt breached the warranty of merchantability," and that, depending on the court's resolution of this issue, it may be necessary to reconsider the portion of Best Bolt's counterclaim dealing with #5 pulleys. Id. at 1016-1017.

On remand, the trial court entered Amended Findings of Fact and Conclusions of Law on March 28, 2014, in which the court adopted the findings in its previous September 21, 2012 order. Under the heading Findings of Fact, the court found that neither the #5 pulleys nor the #3 pulleys supplied by Best Bolt to Gared had lubricated bushings and that Gared did not make a claim that the #3 pulleys were defective. The court found: "Several witnesses from Gared testified that a lubricated bushing was an essential part of a pulley, that lubricated bushings were standard in the industry, that it was unreasonable to make pulleys without lubricated bushings and that a pulley without a lubricated bushing would inevitably have a short useful life." Appellant's Appendix at 7. The court further found: "Day opined that the Best Bolt pulley was 'doomed for failure'

9

because the friction between the metal parts would eventually 'cause the effect known as galling where the metal will grab to the metal and finally it will just completely seize.'" Id. The court also found that "Hylton agreed that the Best Bolt pulleys had failed due to galling between the wheel and axle," that "[h]e also testified that he had done some research on the internet and found one supplier that sold pulleys that could be ordered with or without bushings," that "[h]e also stated that he has his students' [sic] conduct a laboratory experiment involving pulleys, and those pulleys do not have bushings," and that "[h]e testified that 'under certain load-static load or . . . very dynamic loads a non-bushed pulley could work just as well as a bushed pulley.'" Id.

Under the heading Conclusions of Law, the court found that Best Bolt was a merchant in the sale of the #5 and #3 pulleys and turned to an examination of the factors in Ind. Code § 26-1-2-314(2) to determine whether Best Bolt breached its implied warranty of merchantability. The court found:

> The first factor to consider to determine if the #5 pulleys were merchantable is did the #5 pulleys pass without objection in the trade under the contract description. This Court previous [sic] found that there was no oral contract and the Court [of] [A]ppeals affirmed this Court and further noted that it was reasonable to conclude that Gared did not want or expect Best Bolt to replicate the Inventory Sales pulley. The third factor is are the goods fit for ordinary purposes for which such good[s] are used. The Court was provided conflicting testimony regarding whether a pulley was required to have a lubricating bushing. Day opined that he did not think that a pulley should be made without a lubricating bushing regardless of what the requirements were and that the Best Bolt pulley was "doomed to failure" because the friction between the metal parts would eventually "cause the effect known as galling where the metal will grab the metal and finally it will just completely seize". On the other hand, Professor Hylton testified that he had conducted laboratory experiments with his students using pulleys without a lubricating bushing but he agreed that the Best Bolt pulleys failed due to galling between the wheel and axle. He also stated that "under certain load or . . . very low dynamic loads a non-bushed pulley

10

could work just as well as a bushed pulley". This Court finds that the testimony of Day and Professor Hylton demonstrate that the #5 pulleys were not fit for the ordinary purpose being for use in basketball goal systems because the undisputed testimony is that they failed here because they did not have lubricated bushings.

Id. at 11. The court also found the remaining factors were inapplicable to this case. Specifically, it found the second factor does not apply because the goods are not fungible; the fourth factor does not apply because there was no oral agreement on details regarding what specifications the #5 pulleys should have, although it is undisputed Gared ordered the #5 pulleys for use in their basketball goal systems; and that the fifth and sixth factors do not apply because there was not labeling on the #5 pulleys. The court found that "[t]he #5 pulleys were defective when used in Gared's basketball goal systems because they failed and were not useable," that Best Bolt breached its implied warranty of merchantability as to the sales of the #5 pulleys, and that "[t]he breach of the implied warranty of merchantability which was that the pulleys did not have a lubricated bushing was the proximate cause or reason the #5 pulleys failed." Id. at 12.

With respect to damages, the court found that Gared was entitled to damages of $32,393.50, calculated as the fair market value of the pulleys less their salvage value.[3] The court further found that Gared was not entitled to incidental or consequential damages. With respect to consequential damages, the trial court found:

> Gared also requests consequential damages under I.C. § 26-1-2-715. This statute defines consequential damages as any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise. This Court was affirmed on the issue that there was no oral contract which required that the #5 pulleys have

---

[3] The court found that the total cost of the #5 pulleys paid by Gared to Best Bolt was $34,000 and that the metal recycled value was $1,606.50.

11

lubricated bushings and Gared never provided such specifications to Best Bolt in writing or orally. Thus, this Court does not find that consequential damages under this prong of the statute are warranted. Secondly, the statute states that consequential damages include injury to person or property proximately resulting from any breach of warranty. Gared did not present any evidence that any individuals were injury [sic] as a result of the #5 pulleys which actually failed and no evidence was presented that there was any property damage as a result of the #5 pulleys which actually failed. Thus, this Court also does not find that consequential damages under this prong of the statute are warranted. Therefore, this Court declines to award incidental or consequential damages to [Gared].

Id. at 15-16. Gared filed its notice of appeal.

On June 20, 2014, Best Bolt filed a motion to dismiss appeal on the basis that Gared solicited and received payment of the judgment, and a panel of this court denied the motion. Gared argues in its appeal that the trial court erred in failing to award it consequential damages. Best Bolt argues on cross-appeal that the court erred in finding it breached its warranty of merchantability. Best Bolt also requests this court to reconsider the previous order denying Best Bolt's motion to dismiss appeal.

DISCUSSION

I.

We first address Best Bolt's request that we reconsider our previous order denying its motion to dismiss this appeal. Best Bolt argues that Gared filed its notice of appeal and then afterwards accepted payment from Best Bolt in the amount of the judgment. Best Bolt appears to argue that, while the claim on appeal which may reduce Gared's judgment was raised in its cross-appeal, Best Bolt "always disputed liability and damages." Appellee's Brief at 29. In response, Gared maintains that its appeal is in no

12

way inconsistent with its acceptance of payment of the damages awarded by the trial court and that it seeks solely additional damages on appeal.

Ind. Code § 34-56-1-2 states: "The party obtaining a judgment shall not take an appeal after receiving any money paid or collected on a judgment." The statute merely summarizes the common-law rule "that a party cannot accept the benefits of a decision and yet claim it is inconsistent." Ind. & Mich. Elec. Co. v. Louck, 243 Ind. 17, 21, 181 N.E.2d 855, 856 (1962). The Indiana Supreme Court has held that "where no inconsistency in the position taken exists, the general rule is not applicable. An acceptance of an amount to which the acceptee is entitled in any event, does not estop him from appealing or claiming error in the judgment, since there is no inconsistency in such position." Id., 181 N.E.2d at 857. Also, this court has previously concluded that when an appellant accepts a sum pursuant to judgment, but appeals to collect more, the appeal may proceed and a motion to dismiss the appeal must be denied. See R & R Real Estate Co., LLC v. C & N Armstrong Farms, Ltd., 854 N.E.2d 365, 370 (Ind. Ct. App. 2006) ("R & R contends that it is entitled to more, and a reversal of the judgment based on R & R's appeal would not result in R & R receiving any less."), reh'g denied.

In its March 28, 2014 order, the trial court found Best Bolt breached its implied warranty of merchantability as to the sales of the #5 pulleys and awarded damages to Gared of $32,393.50. On appeal, Gared argues the court erred in not awarding an additional sum for consequential damages. On cross-appeal, Best Bolt claims that the court erred in finding that it breached the warranty of merchantability with respect to the

13

pulleys it supplied. If Gared were successful, it would receive additional damages. If Best Bolt were successful, the damages found by the trial court would be reduced.

Although Gared may have collected the amount the trial court ordered, Gared believes it is entitled to consequential damages in addition to the damages awarded and thus appeals only to collect more. This appeal should not be dismissed based on the issue raised by Gared on appeal. See id.

In addition, the fact Best Bolt challenges the court's March 28, 2014 order on cross-appeal does not warrant dismissal. We addressed the issue of dismissal and the effect of a cross-appeal in R & R Real Estate:

> The Supreme Court of Oregon was confronted with such a case and addressed the cross-appellant's motion to dismiss the appeal as follows:
>
> > We do not believe that the plaintiffs' appeal should be dismissed because the defendant has cross appealed. If the defendant had not filed a cross-appeal, it is clear that the court could not have dismissed plaintiffs' appeal on the grounds that plaintiffs had accepted part of the benefits. . . .
> >
> > If a cross-appeal could prevent the original appellant from pursuing a valid appeal on the grounds the cross-appeal allows the appellate court to possibl[y] reduce the award given the original appellant, the cross-appeal could be used as a vehicle to dismiss the original appeal. The losing party could pay part of the judgment, file what could amount to a completely spurious cross-appeal, and by doing so secure the dismissal of the original appeal.
>
> Schlecht v. Bliss, 271 Or. 304, 532 P.2d 1, 6 (1975), disapproved on other grounds by Illingworth v. Bushong, 297 Or. 675, 688 P.2d 379 (1984). See also Marriage of Mask, 143 Or. App. 377, 923 P.2d 1304, 1305-06 (1996) (relying on Schlecht in denying cross-appellant husband's motion to dismiss wife's appeal); Stevens Constr. Corp. v. Draper Hall, Inc., 73 Wis.2d 104, 242 N.W.2d 893, 896 (1976) ("As long as the party accepting the money has not put his right to that money in jeopardy in his own appeal,

14

there is no waiver, even though his right to the money may be endangered by his opponent's cross-appeal or notice of review.") (footnote omitted).

Likewise here, if C & N had not filed a cross-appeal, it is clear that we could not dismiss R & R's appeal on the grounds that it had accepted $10,252.92 from C & N. R & R contends that it is entitled to more, and a reversal of the judgment based on R & R's appeal would not result in R & R receiving any less. While we do not suggest that C & N's cross-appeal is spurious, we agree with the Supreme Court of Oregon's rationale for denying a cross-appellant's motion to dismiss in similar cases. To conclude otherwise would be to encourage gamesmanship and to discourage prompt satisfaction of judgments. We therefore deny C & N's request to dismiss R & R's appeal pursuant to Indiana Code Section 34-56-1-2.

R & R Real Estate, 854 N.E.2d at 369-370.

Similarly, had Best Bolt not filed a cross-appeal, it is clear we could not dismiss Gared's appeal on the grounds it accepted payment from Best Bolt for damages as determined by the trial court. Gared asserts it is entitled to additional damages, and its claim on appeal would not result in it receiving any less. Consistent with the reasoning in R & R Real Estate, we decline to dismiss Gared's appeal based on the fact that Best Bolt raised an issue on cross-appeal which, if successful, would reduce the amount of damages to which Gared is entitled. While Best Bolt argues it has always disputed its liability, Best Bolt may have elected to appeal or not to appeal the trial court's March 28, 2014 order, and Gared did not control Best Bolt's decision. We do not wish to encourage or incentivize appellees to raise issues on cross-appeal for the purpose or additional purpose of seeking a dismissal of the appeal or to discourage prompt satisfaction of judgments. We deny Best Bolt's request to dismiss Gared's appeal.

15

II.

We next address the issue raised by Best Bolt on cross-appeal of whether the trial court erred in finding it breached its implied warranty of merchantability with respect to the #5 pulleys it supplied. Ind. Code § 26-1-2-314(2) provides:

Goods to be merchantable must at least be such as:

(a)     pass without objection in the trade under the contract description; and

(b)     in the case of fungible goods, are of fair, average quality within the description; and

(c)     are fit for the ordinary purposes for which such goods are used; and

(d)     run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved; and

(e)     are adequately contained, packaged, and labeled as the agreement may require; and

(f)     conform to the promises or affirmations of fact made on the container or label if any.

Any action based on breach of warranty requires evidence showing not only the existence of the warranty but that the warranty was broken and that the breach of warranty was the proximate cause of the loss sustained. Frantz v. Cantrell, 711 N.E.2d 856, 860 (Ind. Ct. App. 1999). When the sufficiency of the evidence is questioned on appeal, we will not reweigh the evidence but will consider only that evidence most favorable to the appellee together with the reasonable inferences to be drawn therefrom. Id. Moreover, when the trial is before the court, we must accept the ultimate facts as

16

found by the trial court if there is sufficient evidence to support such facts, and may not reverse the judgment unless it is clearly erroneous.  Id.

Best Bolt contends on cross-appeal that it did not breach the warranty of merchantability.  It argues that Gared was seeking a #5 pulley at a bargain price and that Needler, an operations manager for Gared, knew that pulleys without bushings were sold in the marketplace.  Best Bolt asserts there was no evidence that the standard of trade is that every pulley must have a bushing, which was consistent with e-mails by Needler and Turner, a purchasing manager for Gared, regarding whether Best Bolt could provide the #5 pulleys with an oilite bushing.[4]  Best Bolt also argues that the #3 pulleys it supplied to Gared lacked a bushing and Gared has made no claim the #3 pulleys were defective.  In response, Gared maintains that the trial court properly held Best Bolt breached the implied warranty of merchantability, and that the evidence established that the industry standards require a pulley to have a lubricated bearing in order to pass without objection in the trade and to be fit for the ordinary purposes for which such goods are used.  Gared argues the court's finding should be affirmed because the #5 pulleys lacked a lubricating bearing and were unusable for the purpose for which they were sold.

_____

[4] Best Bolt cites to an exhibit showing that Needler sent an e-mail message to Turner on November 11, 2008, stating, "[p]lease check with Best Bolt to see if they can provide the #5 pulleys with an oilite bushing," and that later that day Turner sent an e-mail message to a quality manager at Best Bolt forwarding Turner's e-mail message and stating: "Still need an answer on returning the shipment of pulleys and can you provide them (#5's) with an iolite [sic] bushing and if so, what's the pricing?" Appellee's Brief at 8 (citing Defendant's Exhibit L-1).  According to the court's findings, the pulleys supplied by Best Bolt "began failing in the fall of 2008" and "were seizing or locking up and would not turn when lifting or lowering the basketball systems" and that "Gared notified Best Bolt of the failure of the pulleys and requested Best Bolt to accept return of the remaining pulleys." Appellee's Appendix at 9. The record contains several e-mail messages between Gared and Best Bolt in December 2008 regarding the problems with the pulleys, possible solutions suggested by Best Bolt, Gared's responses to the suggested solutions, and Gared's request for a credit for the #5 pulleys.  The e-mails of Needler and Turner reveal that Gared desired to find a replacement for the #5 pulleys that would have a lubricated bushing.

17

The evidence in this case supports the trial court's conclusion that the #5 pulleys supplied by Best Bolt failed and that they failed because they did not have a lubricated bushing. Day testified that his opinion was that a pulley without a lubricated bushing or bearing is doomed for failure because of the friction in the pulley. Day testified that "part of a bearing['s] function is to level out both load and speed," that the effect of not having a bearing in a pulley used to lift a load is "friction, heat," and that as a result "eventually it'll [] cause the effect known as galling where the metal will grab to the metal and finally it will just completely seize." Transcript at 274. Hylton agreed that the Best Bolt pulleys had failed due to galling between the wheel and axle. When asked if dynamic testing of the pulleys would have been appropriate, Hylton said, "I would've thought it would've been mandatory." Id. at 476. He testified that "under certain load – static load or statics or very low dynamic loads a non[-]bushed pulley could work just as well as a bushed pulley." Id. at 509.

The undisputed evidence establishes that the ordinary purpose of a pulley is to bear a dynamic load. In its September 21, 2012 order, the court found that, according to Day, the pulleys sold by Best Bolt were not fit for the purpose of raising and lowering basketball systems, that Day believed the pulleys would not pass a dynamic test because they lacked the essential component of a lubricated bushing or bearing, that they were not fit for the ordinary purposes for which #5 pulleys are used, and that Hylton believed that dynamic testing was mandatory to determine if the sample pulleys provided by Best Bolt would meet Gared's requirements. In its March 28, 2014 order, the trial court set forth the testimony and evidence upon which it relied in finding that Best Bolt breached its

18

implied warranty of merchantability and specifically adopted its September 21, 2012 findings. After noting the testimony of Day and Hylton set forth above, the court found, with respect to the third factor under Ind. Code § 26-1-2-314(2), that "the testimony of Day and Professor Hylton demonstrate that the #5 pulleys were not fit for the ordinary purpose being for use in basketball goal systems because . . . they did not have lubricated bushings" and that therefore Best Bolt breached its implied warranty of merchantability as to the sales of the #5 pulleys. Appellant's Appendix at 11.

Our review of the record demonstrates there is sufficient evidence to support the findings of the trial court that the #5 pulleys manufactured without lubricated bushings, which caused the pulleys to fail, cannot be said to "pass without objection in the trade" or that they "are fit for the ordinary purposes for which such goods are used." See Ind. Code § 26-1-2-314(2)(a), -314(2)(c). The e-mail messages of Needler and Turner to which Best Bolt cites, which were sent when or after the pulleys began to fail and it was discovered the pulleys did not have a lubricated bushing, do not establish that #5 pulleys without lubricated bushings would pass without objection or would be fit for the ordinary purposes for which such pulleys are used.

Based upon the record, we conclude the trial court's determination that Best Bolt breached its implied warranty of merchantability in its sale of #5 pulleys to Gared is supported by the evidence and was not clearly erroneous. See Frantz, 711 N.E.2d at 860 (holding the court's determination Frantz breached the implied warranty of merchantability in its sale of shingles was supported by the record and was not clearly erroneous).

19

III.

The next issue is whether the court erred or abused its discretion in not ordering Best Bolt to pay Gared consequential damages in connection with its breach of warranty. Generally, the computation of damages is a matter within the sound discretion of the trial court. Irmscher Suppliers, Inc. v. Schuler, 909 N.E.2d 1040, 1049 (Ind. Ct. App. 2009). A damage award will not be reversed upon appeal unless it is based on insufficient evidence or is contrary to law. Id. In determining whether the award is within the scope of the evidence, we may not reweigh the evidence or judge the credibility of witnesses. Id.

The trial court awarded damages to Gared in the amount of $32,393.50, calculated by determining the cost of the pulleys paid by Gared to Best Bolt less their salvage value, and found that Gared was not entitled to incidental or consequential damages. Gared does not challenge the award of $32,393.50 or argue the court erred in not awarding incidental damages. Rather, Gared argues the court erred in not ordering Best Bolt to pay consequential damages under Ind. Code § 26-1-2-715.

Ind. Code § 26-1-2-714 provides:

(1)     Where the buyer has accepted goods and given notification (IC 26-1-2-607(3)), he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2)     The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

20

(3)     In a proper case any incidental and consequential damages under IC 26-1-2-715 may also be recovered.

Ind. Code § 26-1-2-715(2) provides:

Consequential damages resulting from the seller's breach include

(a)     any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b)     injury to person or property proximately resulting from any breach of warranty.

A plaintiff may recover consequential damages if they are the direct, immediate, and probable result of the breach of an implied warranty. Irmscher Suppliers, 909 N.E.2d at 1050-1051 (citing Bob Anderson Pontiac, Inc. v. Davidson, 155 Ind. App. 395, 293 N.E.2d 232, 236 (1973)). The issue of whether claimed consequential damages are the foreseeable and proximate result of a breach of an implied warranty is generally determined by the trier of fact. Id. at 1051.

Gared argues the official comments to Ind. Code § 26-1-2-715 "reflect the liberality with which consequential damages are to be awarded."[5] Appellant's Brief at

---

[5] The Official Comments to Ind. Code § 26-1-2-715 to which Gared points provide:

2.     Subsection (2) [Ind. Code § 26-1-2-715(2)] operates to allow the buyer, in an appropriate case, any consequential damages which are the result of the seller's breach. The "tacit agreement" test for the recovery of consequential damages is rejected. Although the older rule at common law which made the seller liable for all consequential damages of which he had "reason to know" in advance is followed, the liberality of that rule is modified by refusing to permit recovery unless the buyer could not reasonably have prevented the loss by cover or otherwise. Subparagraph (2) carries forward the provisions of the prior uniform statutory provision as to consequential damages resulting from breach of warranty, but modifies the rule by requiring first that the buyer attempt to minimize his damages in good faith, either by cover or otherwise.

21

12. Gared contends that Best Bolt was aware that the pulleys were going to be utilized in basketball systems and that "[i]t is certainly foreseeable that if the pulleys that they provided were defective, [Gared] could be required to remove the pulleys from the backstops and replace them with non-defective pulleys." Id. at 13. Gared argues that it presented evidence of the costs it incurred in shipping functional pulleys to the job sites, the cost of functional pulleys, the labor to replace the defective pulleys, the employee cost of supervising the replacement of the pulleys and the equipment rental and travel expenses incurred, and that these expenses totaled $298,474.89. Gared claims that, while there may have been a finding there was no oral contract, there was a finding the pulleys were defective and that the court erroneously invoked an additional requirement of the necessity of a contract provision addressing the deficiency in the goods purchased.

Best Bolt maintains that, although Gared argues it was aware that the pulleys were to be used in basketball backstop systems, Turner testified she never showed Sparks how the system operated, Sparks testified that he did not learn the pulleys were to be used in a basketball system until after the first order was placed, and that the only particulars Turner gave to Best Bolt about the #5 pulleys were that they had to meet a certain load rating. Best Bolt also argues that Ind. Code § 26-1-2-714 provides that a court "may"

---

3.  In the absence of excuse under the section on merchant's excuse by failure of presupposed conditions, the seller is liable for consequential damages in all cases where he had reason to know of the buyer's general or particular requirements at the time of contracting. It is not necessary that there be a conscious acceptance of an insurer's liability on the seller's part, nor is his obligation for consequential damages limited to cases in which he fails to use due effort in good faith.

    Particular needs of the buyer must generally be made known to the seller while general needs must rarely be made known to charge the seller with knowledge.

    Any seller who does not wish to take the risk of consequential damages has available the section on contractual limitation of remedy.

award consequential damages and does not use the words "shall" or "must" or similar words. Appellee's Brief at 15.

The court's March 28, 2014 order addressed the application of paragraphs (a) and (b) of Ind. Code § 26-1-2-715(2). With respect to paragraph (b), providing for consequential damages for injury to person or property proximately resulting from any breach of warranty, the court found that Gared did not present evidence that any individuals were injured and that no evidence was presented that there was any property damage as a result of the #5 pulleys which actually failed. Gared does not point to evidence that injury to person or property resulted from the breach of warranty and appears to focus its argument on paragraph (a) of the statute. See Appellant's Reply Brief at 5 ("Gared does not contend that there was injury to any person . . . . Gared seeks consequential damages based upon the *first prong* of the statute which allows recovery . . . for any loss resulting from the general or particular requirements and needs which seller had reason to know.") (emphasis added).

With respect to paragraph (a), the court found, "[t]his Court was affirmed on the issue that there was no oral contract which required that the #5 pulleys have lubricated bushings and Gared never provided such specifications to Best Bolt in writing or orally" and thus that consequential damages under paragraph (a) were not warranted. Appellant's Appendix at 15. Ind. Code § 26-1-2-715(2) provides that consequential damages include loss resulting from "general or particular requirements and needs of which the seller at the time of contracting had reason to know . . . ." We also note that Ind. Code § 26-1-2-714(3) provides that, in a proper case, consequential damages "*may*

23

also be recovered." (Emphasis added). We are not persuaded that the trial court's reference to its previous finding that the evidence did not establish the existence of an oral contract[6] means that the court added a contractual requirement not present in the statute. It appears the court noted there was no oral contract because the language of paragraph (a) includes the phrase "at the time of contracting" in referring to when a seller must have had reason to know of any needs of the purchaser. In any event, the court expressly found that Gared never provided detailed specifications to Best Bolt in writing or orally. See Appellee's Appendix at 7-8 (the court's findings of fact include in part that "Connerly agreed that Gared did not provide any specifications about the requirements for the pulleys which they wanted to purchase" and that "all the employees of Best Bolt testified they never provided Gared a specification sheet for the pulleys"). The court found this fact important and that it supported the determination that consequential damages were not warranted. See Ind. Code § 26-1-2-715, Comment 3 ("Particular needs of the buyer must generally be made known to the seller . . . ."). The evidence did not obligate the trial court to find this a proper case for an award of consequential damages. Based upon the record, we cannot say the court erred or abused its discretion in declining to award consequential damages to Gared.

CONCLUSION

For the foregoing reasons, we affirm the trial court's order of March 28, 2014, in all respects.

---

[6] According to the September 21, 2012 findings, Gared asserted that Best Bolt agreed to provide pulleys in conformity with the sample pulleys which Turner provided to Sparks. This court affirmed the trial court's finding that the evidence did not establish such an oral agreement.

24

Affirmed.

BARNES, J., and BRADFORD, J., concur.